59 CCPA

**The UNITED STATES, Appellant,**

v.

**Jovita PEREZ, Appellee.**

**Customs Appeal No. 5408.**

United States Court of Customs and Patent Appeals.

Aug. 17, 1972.

Worley, J., took no part.

9. Registration No. 718,775, granted July 25, 1961.

L. Patrick Gray, III, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Herbert P. Larsen, New York City, for the United States.

Stein & Shostak, Los Angeles, Cal., attorneys of record, for appellee. Marjorie M. Shostak, Los Angeles, Cal., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

BALDWIN, Judge.

This is an appeal by the United States from the decision and judgment of the United States Customs Court, Third Division,[1] sustaining the importer's protest against the action of customs officials denying non-dutiable status to certain American made parts used in Mexico in constructing railway boxcars imported into the United States. The boxcars were classified as railway cars, dutiable at 18 per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as amended by T.D. 55816.[2] That classification is not in dispute.

The issue is whether, in assessing duty on the imported boxcars, allowance should have been made for the involved parts under the provisions of paragraph 1615(a) of the Tariff Act 1930, as amended by the Customs Administration Act of 1938, 52 Stat. 1077.[3] That paragraph provides free entry for:

> Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means * * *.

The parts in question are Z beams and axles made in the United States. Two of the Z beams were components of each of the boxcars imported and four of the axles were used in each boxcar. The two Z beams, each 613 inches long, were used in making the center sill of the boxcar. They were first placed side by side in a jig with longitudinal edges of two corresponding end legs of the "Z" in engagement, thus forming a U-shaped channel. The other end legs of the "Z" formed flanges extending perpendicularly outward from the open edges of the channel as shown in the drawing below:

[A6209]

---

1. 64 Cust.Ct. 120, C.D. 3969 (1970).

2. Paragraph 397 of the Tariff Act of 1930, as amended, provides:

   Articles or wares not specially provided for, partly or wholly manufactured, not plated with platinum, gold, or silver, and not colored with gold lacquer:
   * * * * *
   Composed wholly or in chief value of iron, steel, copper, brass, zinc, aluminum, or other base metal (except lead, tin or tinplate):
   * * * * *
   Railway cars, and parts thereof ................18% ad val.

3. Appellant does not question that all formal requirements for free entry have been fulfilled.

Two castings made in Mexico were then placed in the channel at the ends. The castings had slots and holes in them, which were used as guides in burning corresponding openings into the end portions of the beams with an acetylene torch. The castings were then riveted or bolted in the channel and various other holes were formed in the beams. Other Mexican-made members were inserted in the channel and either welded or bolted in place, partially forming a center sill.

The partially-formed sill with the other parts was then transferred to another jig. There it was disposed right side up and bolted, through certain of the holes previously made, with a filler block beneath the center to bend the beams and give them a positive camber.[4] The two Z beams were then welded together in that position. The sill was then removed from that jig, other members described as "body bolster" and "cross bearer" subassemblies tack welded to the beams, and those assemblies and "center fillers," also previously tack welded, were subsequently affixed by continuous welding.

The axles were sent to Mexico in rough turned condition. There, portions known as wheel seats and journals were smooth turned on a lathe and the axles were subsequently used to mount the wheels on the car. The turning process for each axle took about thirty minutes and removed about one-eighth inch of material.

The Customs Court sustained the protest solely on the authority of United States v. Oakville Company, 402 F.2d 1016, 56 CCPA 1, C.A.D. 943 (1968), describing the importations there as follows:

> The American-made articles in Oakville consisted of common pins one inch in length and rolls of one-inch tape exported to Canada. In Canada, the pins and paper tape were fed into an automatic machine which put two longitudinal parallel ridges in the tape

and simultaneously inserted the pins through the ridges at accurately spaced intervals. Lengths of the pin-loaded tape were returned to the United States on wooden cores with a labelled cardboard disc stapled on each side * * *.

The court in that case held that both the pins and the paper tape were duty free under paragraph 1615(a). The Customs Court considered the reasons the court held the paper duty free in the Oakville, "as a matter of law," to be "equally applicable" to the Z beams and axles in these protests. It quoted the "reasons" from Oakville as follows:

> The significant fact here is that the pin-carrying paper ribbon is identifiable as having been made from the exported paper tape and as such is American goods returned, within the contemplation of paragraph 1615(a). As to the other requirement that it is not "advanced in value or improved in condition," looking at this problem from the standpoint of commercial reality, as we must, Amity Fabrics, Inc. v. United States, 43 Cust.Ct. 64, 67, C.D. 2104, and cases therein cited, it appears to us that as paper tape the exported material has actually been consumed in making another article— as were the pins—and its value as an article of commerce per se has been destroyed, not advanced. * * *

Appellant does not herein challenge the result in Oakville but seeks to distinguish it. Thus, it finds a significant distinction between the case where the pins and paper not only could be separated but were necessarily separated in use and in the present case where the Z bars were so processed and joined to other elements in the manufacturing process as to preclude "constructive segregation" as it regarded the case law to require. It argues particularly that the present Z beams and axles were advanced in value and improved in condition whereas the court found to the con-

---

4. The purpose of the positive camber apparently was to prevent the center sill from sagging under the load in the finished boxcar.

trary with respect to the paper tape in *Oakville*.

## Opinion

### I. The Z-beams

As is pointed out by appellant, neither paragraph 1615(a) of the 1930 Tariff Act nor its predecessor provisions provided for American-manufactured *components* of new commercial entities constructed abroad.[5] Nevertheless, the predecessor of this court, in Denike v. United States, 5 Ct.Cust.Appls. 364, T.D. 34553 (1914), held certain American-made components of an importation to be free of duty. There sets of railway engine wheels carrying tires and mounted on axles were returned to the United States after repairs had been made on the tires, but not the axles and wheels, in Mexico. The court stated:

> \* \* \* we think that merchandise imported into the country made up in part of American goods entitled to free entry and in part of goods not entitled to free entry should not be assessed for duty as entireties if the components of the importation are in fact distinct articles and so distinguished one from the other that their several dutiable quantities, weights, measures, or values may be correctly ascertained.
> \* \* \*

The court observed that the axles, wheels and tires were "not only readily separable one from the other, but are as a matter of fact frequently separated either to make repairs or to substitute a new axle, wheel or tire." The rate of duty on the importations were on the basis of weight at one and one-quarter cents per pound. The court concluded:

> As the weight of the German tire might have been readily ascertained and the American wheel and axle had not been at all advanced in value or im-

proved in condition, duty should have been assessed on the weight of the tire and not the weight of the wheel and axle.

■ Strictly speaking, the court in *Denike* treated the separability of the components as one element to be considered in determining whether they qualify for duty-free treatment, rather than considering separability as an absolute requirement. The real rule to be derived from that case is that the value of the U. S. components in the imported merchandise must be easily determinable before those components can qualify for duty-free treatment. Nevertheless, the decisions following *Denike* have interpreted ease of separation of the components as an absolute requirement. This "constructive segregation" requirement was considered satisfied in the *Babb* case, Import Export Service of New Jersey, The Babb Co. v. United States, 37 Cust.Ct. 54, C.D. 1798 (1956). There an American-made aircraft engine was shipped to Canada and installed in an airplane of foreign manufacture, and subsequently imported into this country. The Customs Court ruled that the returned engine was entitled to free entry under paragraph 1615(a). The court found that the character and use of the engine had not been changed, it being capable of being removed by a reverse of the installation procedure and fitted into another airplane, and it concluded that the installation work done in Canada did not advance the value or improve the condition of the engine *per se*. See also C. J. Tower & Sons v. United States, 33 Cust.Ct. 14, C.D. 1628 (1954).

■ The doctrine of constructive segregation has been soundly criticized,[6] and we decline to hold that ease of separation is a prerequisite to duty-free entry in this case. Nevertheless, there is

5. On the other hand, the successor of the 1930 Act, the Tariff Schedules of the United States (TSUS), specifically sets forth conditions for free entry of "Articles assembled abroad in whole or in part of fabricated components, the product of the United States." Item 807.00, TSUS.

6. See Tariff Commission, Tariff Classification Study, Schedule 8, at 12–16 (1960); H.R.Rep.No.342, 89th Cong., 1st Sess. 48–49 (1965).

a basic burden of proof in this type of case, which we find appellee has failed to satisfy. United States v. Bird, 11 Ct. Cust.Appls. 229, T.D. 38991 (1922), involved imported electric generators composed in part of American components including "generator spiders, generator shafts, pole pieces, and pole splines." The court there stated:

> * * * it is incumbent on the importer to establish that these machine parts when returned had not been advanced in value or improved in condition * * *.

The court further observed that it would be reasonable to assume, "at least until the contrary is shown," that the incorporation of the American parts in the generators advanced the value or improved the condition of the parts or both. Finding that the importer had failed to discharge its burden of proving the contrary, the court held the parts were not entitled to duty free entry.

A similar ruling was made in Raybestos Co. v. United States, 12 Ct.Cust. Appls. 332, T.D. 40484 (1924). The importation there was "a sort of yarn used in making automobile brake linings, composed of two fine brass wires twisted and interwound with two spun asbestos threads * * *, making together a heavy yarn." The brass wire, which was made in the United States, was unchanged in the manufacture of the yarn except being twisted with the asbestos threads. The court distinguished *Denike*, where the wheels and axles were unchanged and were articles distinct from the tires, and pointed out that the imported lining material was a new commercial entity. In denying duty-free status to the wire, the court noted that the imported yarn was more valuable than the wire and asbestos from which it was made and found it reasonable to conclude that the wire had been advanced in value.

■■ In the present case, the burning of the slots and the numerous holes in the 613 inch Z beams, the introduction of the camber followed by continuous welding of the pairs of beams together and the many other steps in the process were steps toward incorporating the Z beams in a boxcar in accordance with their intended purpose. The only reasonable inference from the facts is that the beams were advanced in value and improved in condition. That view is reinforced by the presumption that the original determination of the customs officials in denying free entry was correct and involved findings of all facts necessary to support that determination. See Howland v. United States, 53 CCPA 62, C.A.D. 878 (1966). The burden is on the importer to show, as a matter of fact, that there has been no advance in value or improvement in condition in the article for which he seeks free entry. Air Carrier Supply Corp. v. United States, 44 CCPA 116, C.A.D. 647 (1957), citing *Bird, supra.* Appellee clearly has not met that burden.

## II. *The Axles*

We think that the axles must be held to be advanced in value and improved in condition for generally the same reasons as the Z beams. The smooth turning placed them in condition for their intended use in the boxcar. It does not appear from this record that the axles had any other substantial utility. It can hardly be maintained that the commercial value of the axles was destroyed by the smooth turning process. See also Ford Motor Co. v. United States, 19 CCPA 69, T.D. 44897 (1931). There large rough metal castings exported to Canada for a "profiling operation," consisting in grinding off excess material to bring them a step nearer their intended final form, were held to be improved in condition and advanced in value and thus precluded from duty-free entry under paragraph 1514 of the Tariff Act of 1922, the immediate predecessor of paragraph 1615 (a), *supra.*

The judgment of the Customs Court is reversed.

Reversed.

WORLEY, J., took no part in the decision of this case.