(C.D. 4507)

GENERAL INSTRUMENT CORPORATION *v.* UNITED STATES

Court No. 70/56833

(Decided March 28, 1974)

*Lincoln & Stewart* (*Eugene L. Stewart* of counsel) for the plaintiff.
*Irving Jaffe*, Acting Assistant Attorney General (*James Caffentzis*, trial attorney), for the defendant.

RICHARDSON, Judge: The merchandise in this case consists of horizontal output transformers, termed "flybacks" and used in color television receivers, which were exported from Portugal in 1969 and classified in liquidation upon entry at the port of New York under TSUS item 685.20 as parts of television apparatus at the duty rate of 8 *per centum ad valorem*. The plaintiff-importer alleges in its complaint that the regional commissioner of customs improperly disallowed duty allowances provided for in TSUS item 807.00 as to certain American products incorporated into the imported transformers in Portugal. The items in dispute are kraft paper, mylar, tape, sleeving, magnet wire, and lead wire.

In a footnote to its brief filed after trial of the issues raised by the pleadings, defendant, through its counsel, at p. 3 stated, among other things:

> Defendant is limiting its argument herein to the various wires in dispute. As far as defendant can discern, the remaining articles in dispute, to wit, kraft paper, mylar, tape, and sleeving, are entitled to the same treatment accorded to the anode foil, cathode foil, paper, tabs, mylar, and tape in *General Instrument Corporation* v. *United States*, 60 CCPA [178], C.A.D. 1106, [480] F. 2d [1402], 7 Cust. Bull. No. 31, p. 47 (1973).

And in the conclusion set forth in the brief defendant's counsel at p. 8 states:

> . . . Defendant concedes plaintiff's entitlement to item 807.00 treatment for the kraft paper, mylar, tape, and sleeving components of the imported articles.

In accordance with defendant's concessions the court finds that plaintiff is entitled to the duty allowance provided for in item 807.00 as to the kraft paper, mylar, tape, and sleeving incorporated into the imported transformers.

The question remaining for disposition here is whether the magnet and lead wire are also entitled to item 807.00 treatment.

The evidence in the record indicates that the disputed wire is manufactured in the United States to plaintiff's specifications for use in making coils and lead wire, and is mounted upon spools and exported by plaintiff to Portugal in that condition. In Portugal spools of magnet wire, in the same condition as exported, are despooled and machine wound around kraft paper "dummy" spools with each layer of winding being interleaved with a mylar film strip to form primary or high voltage coils. Still other spools of such magnet wire are machine wound directly onto cardboard coil forms to form convergence coils. [At some point these coil forms are also inserted into the cavity of the primary coils.] When the windings are completed the magnet wire is cut, thus separating the coils from the spooled wire. In the case of the primary coils, various taps are made at winding intervals from which leads emerge [for the purpose of carrying varying amounts of voltages to low voltage circuits in the television receiver in which the transformer is installed].

Also in Portugal lead wires [presumable drawn from spooled lead wire which is cut to length and stripped of insulating material at the ends] are soldered to the convergence coils after the winding has been completed, cut and taped. And in a final stage other lead wire is despooled, machine cut to length and stripped of insulating material at the ends, looped around the convergence coils and positioned to them by means of lead wire "sleeving" that has been treated in a chemical solution which causes the sleeving to expand and then contract around the looped wire when it dries.

The coil assemblies, which comprise the basic components of the transformer, are subjected to other processes such as baking to remove moisture and wax impregnation under vacuum. They are then ready for final assembly along with other components to form the finished transformers imported in this case. The uncontroverted testimony of Joseph Soares, manager of plaintiff's component materials and approval group, is that the wire involved in the making of these coils

was specially fabricated in the United States for use in coils, and when subjected to various tests, was found not to have lost any electrical, chemical, physical, and mechanical properties.

Plaintiff argues that the wire in issue complies with the requirements of item 807.00 so as to be entitled to the duty allowance provided for in that statute, citing the case of *General Instrument Corporation* v. *United States*, 60 CCPA 178, C.A.D. 1106, 480 F. 2d 1402 (1973). Defendant argues that between the time the subject wire was received abroad and the completion of the assembly process in the foreign country the wire underwent such a transformation in form, shape, character, and function as to be disqualified for item 807.00 treatment, citing the case of *E. Dillingham, Inc.* v. *United States*, 60 CCPA 39, C.A.D. 1078, 470 F. 2d 629 (1972).

TSUS item 807.00 provides for the payment of duty upon the full value of the imported article, less the cost or value of products of the United States, as to:

> Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

In C.A.D. 1106 the imported merchandise was aluminum electrolytic capacitors assembled in Taiwan, as to which the importer sought item 807.00 treatment for foil, tape, paper, tabs, and mylar produced in the United States and exported to Taiwan in *rolls* and incorporated into the making of the capacitors abroad. The steps taken in Taiwan involving the disputed materials which were utilized to produce a capacitor roll, involved (1) cutting the anode foil to a specified length from the roll as exported, (2) cutting an anode tab to length from a roll of material, (3) staking the anode tab to the cut anode foil at right angles thereto, (4) interleaving paper and cathode foil from rolls with the anode foil strip and winding them into a roll with the paper between the cathode and anode foils, (5) staking a previously cut cathode tab to the cathode foil at right angles thereto, (6) placing a length of plastic film under the anode tab, (7) adding two or three turns to the rolled-up assembly and then cutting the interleaved paper and cathode foil from the rolls, (8) securing the rolled-up paper and foil assembly against unwinding by applying cellophane tape from a dispenser, (9) immersing the rolled-up assembly in a liquid electrolyte solution, (10) removing the capacitor roll from the electrolyte and welding the cathode lead to the inside of the can, (11) attaching the anode tab to

the inside of a previously made rivet and washer assembly, and (12) inserting the rolled-up assembly into the can thus finishing the capacitor.

In sustaining the importer's claim for item 807.00 treatment of the disputed articles in C.A.D. 1106 which had been rejected in that case by the regional commissioner of customs and the Customs Court, the Court of Customs and Patent Appeals adopted a construction of the concept "assembly" which included sub-assembly operations involving the disputed articles. In this connection, the appeals court said:

> . . . The only reasonable interpretation of item 807.00 is that all elements that go into the imported final article,which meet the conditions the item imposes on the fabricated components are subject to the exclusion it provides.
>
> We find that all the articles in issue here meet those requirements. Concededly all are products of the United States and all went into the imported electrolytic capacitors. The meaning of "fabricated" is broad and without doubt applies to the rolls of foil, paper, cellophane tape and plastic insulating film which obviously were manufactured articles. The articles did not lost [sic] their physical identity in the capacitor "by change in form, shape or otherwise." . . .
>
> *   *   *   *   *   *   *
>
> Since the only changes in the exported articles were "by being assembled" or "by operations incidental to the assembly," the items have not been "advanced in value" as prohibited by provision (c) of item 807.00

And finally, on the matter of whether the disputed items were subjected to further fabrication abroad, our appeals court in C.A.D. 1106 had this to say:

> There remains the matter of whether the items were exported "in condition ready for assembly without further fabrication." . . . The paper in the present case, and the cathode foil in one form of capacitor, were cut to length after being at least partly assembled into the capacitor roll and thus met the provision in question . . . . Although the anode foil, the cathode foil in some cases, the metal tabs and the mylar film were cut to length before assembly with the other articles, we find no reason for considering them subject to any different treatment than the articles cut after assembly. Trimming of the edges of the anode foil amounts to an operation incidental to the assembly process and not to "further fabrication" under item 807.00. . . .

In *E. Dillingham, Inc.* v. *United States*, 60 CCPA 39, C.A.D. 1078, 470 F. 2d 629 (1972), cited by the defendant, the imported merchandise was papermakers' felts exported from Canada, as to which the importer sought item 807.00 treatment for the fiber and the fabric of which the felts were composed and which were of American origin.

In sustaining the Customs Court's rejection of the importer's claim for item 807.00 treatment as to the fiber component, the Court of Customs and Patent Appeals held that the fiber component had been subjected to further fabrication abroad. Our appeals court said:

> We believe that the correct starting point for the application of item 807.00 must be the components as "exported," in the condition in which they leave the United States. The word "components" appears in the introductory clause of item 807.00 and thus a uniform treatment of the word should exist for clauses (a), (b), and (c) thereof. Clause (a) speaks of the components which "were exported" and (c) speaks of improvement "abroad" thus indicating that the condition of a "component" is considered as of its departure from the United States.

In C.A.D. 1078 the fibers were exported from the United States in the bulk, baled form, *en masse*. And as to this state or condition of the fibers, the appeals court said:

> Considering item 807.00 clause (a), we must determine whether operations performed on the exported component between its arrival abroad and the assembly, show that the component, as exported, was not "in condition ready for assembly without further fabrication." As we said in *United States* v. *Baylis Bros. Co.*, 59 CCPA 9, 451 F. 2d 643, C.A.D. 1026 (1971), "the term [assembly] is used to describe the joining or coming together of solids" Id. at [11], 451 F. 2d at 643. Accordingly, it is not until the fiber came together with the other component, the fabric, that assembly occurred. The operations performed upon the fiber component before it met up with the fabric include, at least, the opening, oiling, and carding performed upon the fiber component in Canada. . . .

And as to these interim operations, the court said:

> We find the opening, oiling, and carding operations together constitute "further fabrication" of the fiber within clause (a) of item 807.00. Without the performance of these operations, the fiber component was not ready for assembly.

The decision of the Court of Customs and Patent Appeals in C.A.D. 1078 makes clear that the critical period in determining whether work performed abroad on exported articles (for which item 807.00 treatment is sought) amounts to an "assembly" operation or a "further fabrication" is the period between the arrival of the merchandise abroad and its meeting up with other components in the foreign country.

In the instant case the record shows that the magnet wire in dispute met up immediately and right off of the spool with the kraft paper and mylar [in the case of the primary and high voltage coils] and with the coil form [in the case of the convergence coil] in the winding operation in Portugal. As such, the coil winding operation, including sever-

ance of the wire from the spool, must be deemed to be an "assembly" operation within the purview of even C.A.D. 1078 inasmuch as there were no operations performed on the magnet wire which preceded the winding operation. Moreover, a winding operation *per se* is within the concept of "assembly" as that term is used in item 807.00. See: *General Instrument Corporation* v. *United States, supra.* Thus, the operations performed on the completed coils which utilized the magnet wire, i.e., baking and wax impregnation, must be viewed as being operations which are incidental to an *assembly* operation, consistent with the holding of our appeals court in C.A.D. 1106 on similar facts. Therefore, while there has been a transformation of the disputed magnet wire in its movement from the state of rolled wire as exported to the state of being an integral ingredient of a completed coil, this transformation does not entail changes which fall in a category other than *assembly* or *incidental to assembly* under C.A.D. 1106.

In the case of the lead wire there has, of course, been no such transformation connected with its handling as characterized the handling of the magnet wire abroad. But unlike the magnet wire, there were interim operations performed on the lead wire in Portugal. The evidence shows that *cutting to length* and *stripping of ends* preceded attachment of lead wire drawn from the spool to the convergence coil and to the high voltage coil and plate cap assemblies. However, these interim operations do not amount to a *further fabrication* or *advancement in value* of the lead wire. Cutting and stripping of lead wire are operations comparable to cutting and trimming operations performed on disputed items in C.A.D. 1106. It follows that the disputed lead wire must be considered as being ready for assembly in the condition as exported except for operations *incidental to assembly*, i.e., cutting and stripping.

No issue arises in the case under subdivision (b) of item 807.00 relative to loss of *physical identity* of the disputed wire. And inasmuch as the foregoing disposes of issues in the case arising under subdivisions (a) and (c) of item 807.00 with respect to the wire, the court concludes that plaintiff is entitled to the duty allowance provided for under item 807.00 as to the wire as well as to the merchandise on which concessions have been made.

In view of the evidence of record, and the defendant's concessions, the court finds that the kraft paper, mylar, tape, sleeving, magnet wire, and lead wire in the imported transformers

1. were fabricated components, the product of the United States at the time of their exportation to Portugal;

2. were exported in condition ready for assembly into the imported transformers without further fabrication;

3. did not lose their physical identity in such transformers by change in form, shape, or otherwise; and

4. were not advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process.

The allegations of the complaint herein are sustained, and judgment will be entered herein accordingly.