**Rudolph MILES**

v.

**UNITED STATES.**

C.D. 4689; Court Nos. 73-11-03042, etc.

United States Customs Court.

Feb. 15, 1977.

RE, Judge:

The question presented in these four actions, consolidated for purpose of trial, pertains to the lawful customs duties to be assessed on 200 roller bearing railroad boxcars with cushion underframes exported from Mexico and entered at the port of El Paso, Texas during 1970.

The boxcars were classified under item 690.15 of the Tariff Schedules of the United States [TSUS] which covers "Railroad and railway rolling stock: Passenger, baggage, mail, freight and other cars, not self-propelled," with duty at the rate of 18 per centum ad valorem. Duty was assessed under item 807.00, TSUS, as amended by Public Laws 89–241 and 89–806, upon the full appraised value of the railroad cars less the cost or value of 56 fabricated components of United States origin.

Plaintiff does not dispute the classification, but challenges the refusal of the district director of customs to make an allowance of $395.22 per car in the appraisement under item 807.00 of the tariff schedules. The claimed allowance is for the cost or value of 400 Z-beams, which were first processed in Mexico into floating center sills, and thereafter assembled into the imported railroad cars.[1]

Item 807.00 as amended by Public Laws 89–241 and 89–806, pursuant to which the allowance is claimed, provides:

"Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process

Stein & Shostak, S. Richard Shostak, Los Angeles, Cal., of counsel, for plaintiff.

Irving Jaffe, Acting Asst. Atty. Gen. (Herbert P. Larsen, New York City, trial atty.), for defendant.

1. A list of 56 specialties and parts of American origin for which duty allowances were claimed and granted under item 807.00, TSUS, at the time of entry is attached to the Special Customs Invoice accompanying each entry. No claim was made for the "center sills," the 57th and last item on each list, until after liquidation upon the filing of a protest pursuant to section 514, Tariff Act of 1930, as amended (19 U.S.C. 1514). Plaintiff's second amended complaint makes no reference to "Z-beams," but describes the items in controversy as "center sill sections, the product of the United States, which were assembled abroad into said railroad cars."

such as cleaning, lubricating, and painting. .................. A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart)"

Schedule 8, part 1, subpart B, headnote 3 reads:

"3. Articles assembled abroad with components produced in the United States.—The following provisions apply only to item 807.00:

(a) The value of the products of the United States assembled into the imported article shall be—

(i) the cost of such products at the time of the last purchase; or

(ii) if no charge is made, the value of such products at the time of the shipment for exportation,

as set out in the invoice and entry papers; except that, if the appraiser concludes that the amount so set out does not represent a reasonable cost or value, then the value of such products shall be determined in accordance with section 402 or 402a of this Act.

(b) The duty on the imported article shall be at the rate which would apply to the imported article itself, as an entirety without constructive separation of its components, in its condition as imported if it were not within the purview of this subpart. If the imported article is subject to a specific or compound rate of duty, the total duties shall be reduced in such proportion as the cost or value of such products of the United States bears to the full value of the imported article."

Plaintiff contends that the Z-beams meet every requirement of item 807.00, TSUS, and are thus entitled to the prescribed duty allowance.

Defendant disputes this claim, and maintains that plaintiff has failed to prove compliance with clauses (a), (b) and (c) of item 807.00, TSUS. It also contends that plaintiff has failed to establish the cost or value of the Z-beams as required by headnote 3 of schedule 8, part 1, subpart B, TSUS. Moreover, the defendant urges that, should plaintiff meet its burden of establishing entitlement to an allowance under the tariff item, its measure of recovery is limited to a deduction of the cost or value of only 221 of the 400 Z-beams from the value of the railroad cars. This contention is predicated upon plaintiff's failure to file, at the time of entry, export declarations (Customs Form 4467) for the remaining 179 beams. The declaration is a necessary part of the documentation required by part 10 of the customs regulations to establish their status as products of the United States. It was stipulated at the trial that the 221 Z-beams, for which export declarations were filed and produced, were of American origin.

The first question is whether the record supports plaintiff's claim that the Z-beams were "assembled abroad" in compliance with the conditions set forth in clauses (a), (b) and (c) of item 807.00, TSUS.

### Summary of Operations Performed Abroad.

The operations performed on the Z-beams in Mexico were described by one of plaintiff's witnesses, Mr. Arturo Sanchez, a mechanical engineer and technical manager of Constructora Nacional de Carros de Ferrocarril, S.A., which built the imported railroad cars. They were built for the Atchison, Topeka and Santa Fe Railroad in compliance with A.A.R. (Association of American Railroads) standards.

Mr. Sanchez testified that each of the imported railroad cars contains a floating center sill made up of two steel Z-beams, each 663⅛ inches long. He stated that in order to form the center sill, the Z-beams were first placed in pairs on a jig in a back-to-back position on the long side. After they were aligned, the center was located and the position of the seven stops where the shock absorbers would come in contact was determined. Seven steel stops were then electrically welded to each Z-beam.

One stop was at the center, and three on each side which were equidistant from the center, and which lined up exactly with those on the other beam so that there would be no disalignment in the operation of the cars. In the next step, two slots were burned with an acetylene torch in the wide side, or "web," at each end of both Z-beams. This permits the insertion, at a later stage, of the draft key that fixes the coupler to the yoke, and is part of the system of gears that goes between each car. Each slot was then reinforced with a U-shaped steel strip that was welded around it.

The two Z-beams were then moved to a second jig and butt welded along their length. At this stage, the butt welded Z-beams became and were thereafter referred to as a floating, or sliding, center sill.

The center sill was removed from the jig, inverted, with the butt welded flanges facing downward, and placed upon special supports. In order to maintain the sill in its assemblage, eleven U-shaped guides were welded on each side of the center sill, and seven clamps, necessary to hold the brake pipe, were welded, six on one side and one on the other side of the sill. Since A.A.R. regulations require the brake pipe to cross the center sill, a slot was burned in the web of each Z-beam to allow the brake piping to pass through. Thick striker plates, or reinforcements, were then welded to the extreme end of each center sill to form a frame.

The next step involved the burning, with an acetylene blow torch, and reaming, where necessary, of 31 holes along the short flange, or wing, of each Z-beam. The purpose was to install on each bean four wear plates, to protect the center sill from damage, and seven support plates, to support the various devices and mechanisms, such as the hydraulic shock absorbers, draft gear system, and restorer spring which were to be placed inside the center sill. It was necessary to position the holes with a gauge so that the plates would be aligned and equidistant from the center of the sill.

In the next stage, the wear plates were affixed with bolts and rivets; the draft gear system, spring, yoke and other devices were placed within the floating center sill; the brake tubing was installed; and the support plates were attached with bolts and rivets or screws.

The completed center sill was then lifted and located on the underframe of the railroad car, which was also in an inverted position.

### Clause (a).

Turning to clause (a) of item 807.00, the key question is whether the work performed upon the Z-beams in Mexico, from the time they were placed in pairs on the first jig until their assembly as complete floating center sills into the underframe of the imported railroad cars, shows that they were "fabricated components" exported "in condition ready for assembly without further fabrication." Solely for the purpose of deciding this issue, it is assumed that plaintiff has satisfactorily established the disputed American origin of the 179 beams for which no export declarations were produced.

Defendant, contending that the Z-beams were not "ready for assembly" as required by clause (a), in its brief urges that the burning of 3 slots and 31 holes in each beam was "part of the fabrication of the component" and that "whatever may have been exported [from the United States], it was not a fabricated component * * *." In essence, defendant contends that the Z-beams, which were first processed into center sills, are merely component materials, and that the center sills are the "fabricated components" which were assembled into the imported articles.

■ An article which is subjected to a subassembly process, or operation prior to assembly, is not necessarily precluded from qualifying for item 807.00, TSUS, status. In *General Instrument Corporation v. United States*, C.A.D. 1106, 480 F.2d 1402, 60 CCPA 178 (1973), the appellate court specifically rejected, as being "unreasonably restrictive," what it termed "the artificial single assembly-dual assembly distinction as

determinative of classification under item 807.00." *Id.*, at 1405, 60 CCPA at 182. In the *General Instrument* case, the trial court, in denying the allowance under item 807.00, relied on the single or dual assembly theory espoused by the Customs Court in the case of *Amplifone Corp. v. United States*, 65 Cust.Ct. 58, C.D. 4054 (1970).

The *Amplifone* case interpreted the words "fabricated components * * * which * * * were exported in condition ready for assembly without further fabrication." It reasoned that item 807.00 required distinguishing between a single and a dual assembly process. In a *single* assembly process, the United States product is directly assembled or incorporated into the ultimate merchandise. In a *dual* assembly process, the article is first incorporated into a subassembly which, in turn, is assembled or incorporated into the ultimate merchandise. The *Amplifone* case held that for item 807.00 treatment, the "fabricated component" had to be a "complete" unit in itself, and not subject to further assembly other than directly into the final product to be exported.

By the application of the reasoning of the *Amplifone* case, the trial court, in the *General Instrument* case, held that, since the disputed articles were subject to a *dual* assembly process, they were not "fabricated components" within the meaning of item 807.00.

In reversing the decision of the trial court, and rejecting the rationale of the *Amplifone* case, the Court of Customs and Patent Appeals stated:

"The inquiry under item 807.00 should not focus on the identification of possible sub-units of the whole product and the relationship between the disputed element and such sub-units. Instead, classification under item 807.00 depends upon the relationship of the disputed element to the whole. The steps to which the disputed element is subjected are, of course, relevant to the issue, but we do not agree that initial assemblage into an artificially identified sub-unit is a step which necessarily precludes a finding of

mere assembly." 480 F.2d at 1405, 60 CCPA at 182.

Nevertheless, focusing the inquiry on the relationship of the Z-beams to the completed boxcars for export, and the steps performed on the Z-beams until their incorporation into the undercarriages, the court finds that the operations performed in Mexico, including the burning of slots and holes in the Z-beams, constituted "further fabrication" within the meaning of clause (a) of item 807.00, TSUS.

As the record amply demonstrates, the burning of slots and holes was an indispensable operation to the assembly of the Z-beams as center sills into the railroad cars. The record discloses that the slots were necessary for the insertion of the draft key which fixes the coupler to the yoke. They were likewise necessary to permit the brake piping to pass through the center sill as required by the A.A.R. regulations. The holes were essential for installation of the wear plates, which protect the center sill, and of the support plates, which keep the various devices in place inside the center sill. These operations show that the Z-beams were not "ready for assembly without further fabrication." The operations on the Z-beams are analogous to the opening, oiling and carding operations performed abroad prior to the assembly upon the bulk fibers in *E. Dillingham, Inc. v. United States*, C.A.D. 1078, 470 F.2d 629, 60 CCPA 39 (1972). In the *Dillingham* case, the bulk fibers had been exported to Canada together with fabric to be made into papermakers' felt, and were returned to this country. The appellate court held that the opening, oiling and carding of the bulk fibers constituted "further fabrication" without which the fiber component was not in condition ready for assembly with the fabric under clause (a) of item 807.00, TSUS. In the case at bar, the burning of the slots and holes in the Z-beams constituted fabrication of a more advanced nature than the operations performed in the *Dillingham* case.

Also pertinent is *The Rubberset Company et al. v. United States*, C.D. 4560, 383 F.Supp. 1403, 73 Cust.Ct. 107 (1974). In the

*Rubberset* case, nylon filaments of American origin were shipped in bulk to Canada. There they underwent various sorting and selection processes prior to their assembly into paint brush knots and paint brushes that were subsequently exported to the United States. The court held that this interim processing constituted a "further fabrication" within the meaning of clause (a) of item 807.00, TSUS.

Plaintiff cites the previously discussed case of *General Instrument Corporation v. United States*, C.A.D. 1106, 480 F.2d 1402, 60 CCPA 178 (1973) as an example of an assembly process within the purview of clause (a). That case, however, is readily distinguishable from the case at bar. In the *General Instrument* case, anode foil, cathode foil, paper, metal tabs, plastic insulating film and cellophane tape were exported from the United States to Taiwan for assembly into electrolytic capacitors. All of these items, however, entered directly into the assembly process without any prior treatment other than cutting some of the components to length and trimming the edges of the anode foil. To the same effect, see *General Instrument Corporation v. United States*, C.A.D. 1128, 499 F.2d 1318, 61 CCPA 86 (1974) (television deflection yokes) and *General Instrument Corporation v. United States*, 72 Cust.Ct. 86, C.D. 4507 (1974), *appeal dismissed*, 62 CCPA 109 (1974) (horizontal output transformers). In the case at bar, the operations pertaining to the burning of the slots and holes were essential prerequisites to the processing of the Z-beams into the center sills which were incorporated into the railroad cars. As shown in the recitation of the summary of testimony, these operations indicate that the Z-beams were not exported "in condition ready for assembly without further fabrication."

The operations performed on the Z-beams are also distinguishable from the cutting process employed in *United States v. Texas Instruments Incorporated*, 64 CCPA, C.A.D. 1178 (1976), in which completely fabricated and tested transistor chips were specially arranged by the thousands in rows and

columns on silicon slices. They were exported abroad for separation and assembly of the individual chips into operative transistors. Analogizing the cutting process to the operations performed on the wires or the foils in the *General Instrument* cases, *supra*, the court held that the cutting or separation of the chips did not constitute "further fabrication" within the meaning of clause (a) of item 807.00, TSUS.

### Clause (b).

■ Although defendant states that the Z-beams were "changed in form and shape," the court agrees with plaintiff that, for purposes of item 807.00, TSUS, clause (b), they had not "lost their physical identity * * * by change in form, shape, or otherwise" upon their incorporation as center sills into the railroad cars. Neither the burning of holes and slots in the beams, nor the welding of two beams together into a center sill, resulted in a loss of their physical identity. That the Z-beams did not lose their physical identity may be seen in various photographs and diagrams submitted which illustrate, at different stages, the work performed on the beams.

■ Physical changes in the article do not necessarily lead to loss of "physical identity" within clause (b) of item 807.00. In the *Dillingham* case, *supra*, the appellee argued that the fabric component employed in making the exported article did not meet the requirements of clause (b) because its width was changed; it had been completely perforated with holes; and had become a blend of fabric and fibers. The appellate court disagreed:

"The question, however, is not whether the fabric was 'changed' by assembly to form the article, but whether it has lost its 'physical identity in such articles by change in form, shape, or otherwise.' Neither the change in the width of the fabric nor its having been 'perforated with holes' is loss of physical identity. Further, an examination of the felts reveals that the fabric has not lost its physical identity by having the fibers entwined therein. Certainly the needled *as-*

*sembly* acquired a 'new physical identity' as a papermaker's felt with a new 'commercial utility' but this does not necessarily mean that the *component* lost its physical identity. We find that it did not." (Emphasis in original.) 470 F.2d at 635, 60 CCPA at 46.

Furthermore, as the Court of Customs and Patent Appeals stated in *United States v. Baylis Brothers Co.*, C.A.D. 1026, 451 F.2d 643, 59 CCPA 9, 12 (1971):

"The legislative history makes it equally apparent, however, that Congress did not intend to exclude articles from item 807.00 merely because the American components had undergone some change of form or shape. The test specified in item 807.00 is whether the components have been changed in form, shape, or otherwise to such an extent that they have lost their *physical identity* in the assembled article. The term 'physical identity' was used to exclude from item 807.00 those assembled articles whose American components are 'chemical products, food ingredients, liquids, gases, powders,' and the like." (Footnote omitted; emphasis in original.)

This physical identity test was reiterated in two later cases: *General Instrument Corporation v. United States*, 183 C.A.D. 1106, 480 F.2d 1402, 60 CCPA 178 (1973); *General Instrument Corporation v. United States*, C.A.D. 1128, 499 F.2d 1318, 61 CCPA 86, 90 (1974).

### Clause (c).

To qualify for the claimed item 807.00 allowance, subdivision (c) of that item requires that the articles "have not been advanced in value or improved in condition abroad except by being assembled and by operations incidental to the assembly process such as cleaning, lubricating, and painting." This requirement of clause (c) is not met since it is clear that the Z-beams were "advanced in value or improved in condition" by the various operations performed in Mexico.

Any doubt as to the meaning of clause (c) is resolved by the following statements in H.R.Rep.No.342, 89th Cong., 1st Sess. pp. 48–49 (1965), accompanying H.R. 7969, subsequently enacted as the Tariff Schedules Technical Amendments Act of 1965, Pub.L. 89–241, which amended item 807.00, TSUS:

"It appears that under the language of item 807.00 minor operations such as painting incidental to assembly abroad may be precluded, and that in certain respects the item is ambiguous, with the result that it imposes undue administrative burdens on customs officers.

Section 72 of the bill would amend item 807.00 so that it would apply to articles assembled abroad in whole or in part of fabricated components, the product of the United States, which * * * (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

*       *       *       *       *       *

The amended item 807.00 would specifically permit the U.S. component to be advanced or improved 'by operations incidental to the assembly process such as cleaning, lubricating, and painting.' It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. For example, in fitting the parts of a machine together, it may be necessary to remove rust; to remove grease, paint, or other preservative coatings; to file off or otherwise remove small amounts of excess material; to add lubricants; or to paint or apply other preservative coatings. It may also be necessary to test and adjust the components. Such operations, *if of a minor nature* incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad." (Emphasis added.)

The burning of slots and holes in the Z-beams cannot be considered an operation "incidental to the assembly process" such as the removal of "small amounts of excess material." The operations performed here

clearly are not *ejusdem generis* with "cleaning, lubricating, and painting," and, surely, are not of a "minor nature," as contemplated by the House Report.

Item 807.00, TSUS, was subsequently amended by Public Law 89–806. This amendment, however, merely removed the requirement of verifying that the American components were exported for the purpose of assembly and return as assembled articles to the United States. It was not designed to change the intended meaning of the earlier amendment as it pertained to clause (c).

Although made in the context of a different statute, the statements of the appellate court, in the incorporated case of *United States v. Jovita Perez*, C.A.D. 1065, 464 F.2d 1043, 59 CCPA 190 (1972), are also pertinent. The *Perez* case dealt with Z-beams of United States origin that were made in Mexico into fixed center sills in somewhat similar manner to the fashioning of the beams of the present case into the floating center sills, and then incorporated into railway cars imported into the United States. Claim for free entry of the beams was made under the predecessor statute to item 807.00, TSUS, i. e., paragraph 1615(a), Tariff Act of 1930, as amended, which provided for:

"Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means * * *."

In reversing the decision of the Customs Court, and holding that the beams had been advanced in value and improved in condition, the Court of Customs and Patent Appeals stated:

"In the present case, the burning of the slots and the numerous holes in the 613 inch Z beams, the introduction of the camber followed by continuous welding of the pairs of beams together and the many other steps in the process were steps toward incorporating the Z beams in a boxcar in accordance with their intended purpose. The only reasonable inference from the facts is that the beams were advanced in value and improved in condition. That view is reinforced by the presumption that the original determination of the customs officials in denying free entry was correct and involved findings of all facts necessary to support that determination. See *Howland v. United States*, 53 CCPA 62, C.A.D. 878 (1966)." 464 F.2d at 1047, 59 CCPA at 195.

The appellate court indicated that the burden was on the importer to show "as a matter of fact, that there has been no advance in value or improvement in condition in the article for which he seeks free duty." *Ibid.* Since the court held that the burden "clearly" had not been met, it reversed the judgment of the trial court.

Notwithstanding the difference between a floating sill and a fixed or stationary sill, and the pertinent statutes, the statements of the court in the *Perez* case are equally applicable here.

In order to prevail, it was incumbent upon plaintiff in this action to prove that the beams "were exported in condition ready for assembly without further fabrication." It was also necessary to establish that they had "not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting."

The testimony of plaintiff's witnesses reveals clearly the numerous steps or processes to which the Z-beams were subjected in Mexico. From the testimony, the inferences are inescapable that they were not ready for assembly without further fabrication, and that they had been advanced in value or improved in condition abroad.

On the evidence of record, the court finds that plaintiff has failed to establish compliance with clauses (a) and (c) of item 807.00, TSUS. Hence, it is the determination of the court that plaintiff is not entitled to the duty allowance provided for in item 807.00 of the tariff schedules.

In view of this holding, it is unnecessary to reach the other questions raised.

Judgment will be entered accordingly.