**Rudolph MILES, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 77–18.**

United States Court of Customs and Patent Appeals.

Jan. 5, 1978.

---

Stein, Shostak, Shostak & O'Hara, Inc., Los Angeles, Cal., attorneys of record, for appellant; S. Richard Shostak, Los Angeles, Cal., of counsel.

Barbara Allen Babcock, Asst. Atty. Gen., David M. Cohen, Chief, Customs Section, Washington, D. C., Herbert P. Larsen, New York City, for the United States.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal is from the judgment of the United States Customs Court, 427 F.Supp. 417, 78 Cust.Ct. 35, C.D. 4689 (1977), dismissing appellant's actions for failure to establish compliance with clauses (a) and (c) of item 807.00, Tariff Schedules of the United States (TSUS), with respect to certain Z-beams manufactured in the United States, and entitlement to the duty allowance provided in item 807.00. We reverse and remand for trial on the remaining issues.

In the four actions consolidated below, 200 railroad boxcars were classified under item 690.15, TSUS, which covers railroad and railway rolling stock. Duty was assessed under item 807.00, TSUS, upon the full appraised value of the boxcars less the cost or value of fabricated components of United States origin. Appellant challenged the refusal of an allowance for the cost or value of 400 Z-beams which were processed in Mexico into floating center sills and thereafter assembled into the imported boxcars.

Item 807.00 (TSUS), as amended, provides (emphasis ours):

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly <u>without further fabrication,</u> (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and <u>except by operations incidental to the assembly process</u> such as cleaning, lubricating, and painting.......... A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart)

Citing *E. Dillingham, Inc. v. United States,* 470 F.2d 629, 60 CCPA 39, C.A.D. 1078 (1972), the Customs Court concluded that the operations performed in Mexico, including the burning of slots and holes in the Z-beams, constituted "further fabrication" within the meaning of clause (a) of item 807.00. Relying principally upon the incorporated case of *United States v. Jovita Perez,* 464 F.2d 1043, 59 CCPA 190, C.A.D. 1065 (1972), the Customs Court also held that the burning of slots and holes and other steps toward incorporating the Z-beams in a boxcar advanced the value and improved the condition of the Z-beams abroad within the meaning of clause (c).

Summarizing the operations performed in Mexico, appellant's witness stated that the Z-beams were first aligned in pairs on a jig. The center was located so that shock absorber stops could be positioned there and equidistant therefrom. While the beams were still aligned on the jig, a slot was burned at each end of each beam for inserting the draft key that fixes the coupler to the yoke. The pair of Z-beams was then moved to another jig where they were butt-welded along their lengths. After removal from the second jig, the center sill (as the joined Z-beams were then called) was fitted with guides to maintain it in its assemblage

and with clamps to hold the brake pipe. A slot was burned in each Z-beam to allow the brake piping to pass through. Positions for thirty-one holes were determined with a gauge and the holes were burned along the flange of each beam. The holes permitted installation of wear plates to protect the center sill from damage and support plates to maintain parts that were placed inside the center sill. Additional apparatus was affixed to the center sill, and the completed center sill was located on the underframe of the boxcar.

## OPINION

■ Relative to clause (a) of item 807.00, the issue is whether the burning of holes and slots in Mexico constituted "further fabrication." The Customs Court viewed the burning of slots and holes as "steps performed on the Z-beams until their incorporation into the undercarriages." The Court concluded that the necessity of these operations showed that the Z-beams were further fabricated.

We think the Customs Court erred in following *Dillingham,* which is distinguishable on its facts. That case concerned a component that was exported from the United States as raw material (wool fiber in the bulk, baled form) "on which much further labor was expended to put it into the condition required to enable it to be needled into the fabric." The operations performed abroad—opening, oiling, and carding the wool—were processing steps that were themselves distinctly preparatory to assembly with the fabric. There was no subassembly involved in the case. A raw material was worked upon to change it into an altered form having new properties.

In the instant case, the Customs Court deemed the operations on the Z-beams analogous to the opening, oiling, and carding performed in *Dillingham,* and concluded that "the burning of the slots and holes in the Z-beams constituted fabrication of a more advanced nature than the operations performed in the *Dillingham* case." We do not agree.

We were presented with a similar situation in *General Instrument Corp. v. United States*, 499 F.2d 1318, 61 CCPA 89, C.A.D. 1128 (1974), in which magnet and lead wire were processed into coils and harnesses (subassemblies) that were assembled into the imported television deflection yokes. In that case, appellee urged upon us precisely the argument that the Customs Court has accepted in the present case—namely, that although an article which is subjected to a subassembly process is not necessarily precluded from qualifying for item 807.00 (*General Instrument Corp. v. United States*, 480 F.2d 1402, 60 CCPA 178, C.A.D. 1106 (1973) (hereafter GI–2)), the rationale of *Dillingham* should be applicable.

Acceptance of the above reasoning would essentially restore, on the basis of *Dillingham*, the artificial single assembly-dual assembly distinction that we rejected in GI–2. As stated above, *Dillingham* involved preparatory processing of raw material prior to a single assembly. That case is inapplicable to the present facts where non-preparatory processing is part of a dual assembly. Further, unlike *Dillingham*, the exported component Z-beams do not require *significant* labor to enable them to be incorporated into boxcars. The evidence established that the total labor in Mexico required a maximum of 104 minutes at a cost of twelve dollars (the value of a pair of Z-beams being alleged as $395), or only 3% of the value of a beam. Clearly, the operations in the present case compare in neither kind nor degree with those in *Dillingham*.

Having disposed of *Dillingham*, we are nonetheless left with the question whether the component Z-beams were further fabricated. With regard to the requirement of clause (a), we agree with appellee that "In its present form, item 807.00 * * * basically encompasses only American merchandise returned without substantial change or improvement." Of course, whether substantial change or improvement has occurred is to be determined from the facts of each case. After thoroughly examining the evidence in its entirety, we hold that the processing of Z-beams in Mexico, especially the burning of holes and slots,

was concomitant with the assembly of center sills and was not substantial enough to preclude qualification under clause (a) of item 807.00.

Noteworthy is the GI–2 case involving the assembly of capacitors. In Taiwan, both anode and cathode tab and foil were subjected, after each was cut to length from a roll, to "staking," whereby the tab and foil were pieced by a series of pins which flared the materials which were then pressed together to flatten the flared portions and cause the foil and tab to adhere to each other. In the present case, the burning of holes in Z-beams is a similar piercing operation, albeit on fifty-five-foot long steel beams by means of acetylene torches. Given the particulars of these operations, i. e., that $15/16''$ holes were necessary in the approximately $1\frac{1}{4}''$ thick flange for attachment of other components of the boxcar, burning holes in Z-beams was no more serious than piercing holes in the tab and foil in GI–2. Similarly, two $13^{11}/_{16}'' \times 2^{15}/_{16}''$ slots for draft keys and one $10'' \times 2\frac{1}{2}''$ slot for the brake piping per beam were not such substantial alterations in the 55' beams as to preclude compliance with clause (a). Of additional significance is the evidence mentioned above that *all* of the processing in México required a maximum of 104 minutes at labor costs of twelve dollars.

We recognize that the dimensions of the components in this case require measures that at first blush might seem to produce dramatic changes. Our conclusion cannot, however, be determined by the mere size of the component. The problem in the instant case is the counterpart of that in *General Instrument Corp. v. United States*, 462 F.2d 1156, 1158, 59 CCPA 171, 173–74, C.A.D. 1062 (1972), where we said:

> Due to the *small* sizes of the parts and the fineness of the gold wire, which is barely visible to the naked eye, highly specialized techniques are required for handling and bonding it to the die. * *

The uncontroverted evidence is that in the course of using the gold wire in the

manner above described, to make electrical connections between the silicon die and the nailhead leads, the physical, chemical, and electrical properties of the wire and its diameter are not changed. The bulk wire is, obviously, cut, and the pieces are bent and welded or otherwise bonded at their ends *in the process of removing the wire from the spool and using it* for its intended purpose as a component in the transistors. [Emphasis added.]

In the present case, the components require their own appropriate techniques because they are *large* steel parts. Such parts must be rigidly secured if they are to withstand the stresses that they must as boxcar components. Thus, in perspective, burning the slots and holes of the aforestated dimensions in 55′ steel Z-beams to permit their assembly is not such substantial change as constitutes further fabrication. Rather, the processing in Mexico was merely part of the assembly of the Z-beams into center sills and "incidental to the assembly process" as provided in item 807.00(c).

■ Regarding clause (c) of item 807.00, TSUS, *United States v. Jovita Perez*, supra, is not dispositive of the present case. The statute that was applied in *Perez*, paragraph 1615(a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, 52 Stat. 1077, 1092, provided free entry for:

> Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by *any* process of manufacture or other means. [Emphasis added.]

In that case, this court concluded from facts similar to those in the instant case that "The only reasonable inference [from the customs officials' determinations] * * * is that the beams were advanced in value and improved in condition" by the steps toward incorporating the Z-beams in a boxcar. Faced with such an inference, appellee Perez failed to meet "The burden * * * on the importer to show, as a matter of fact, that there has been *no* advance in value or improvement in condition in the article for which he seeks free entry." 464 F.2d at 1047, 59 CCPA at 195 (emphasis added).

■ In contrast to paragraph 1615(a) involved in *Perez*, item 807.00 logically assumes that there *has been* an advancement or improvement, but limits the extent of the advancement in value or improvement in condition to that which is brought about solely *by the act of assembly or operations incidental thereto.* Hence, appellant here does not have the burden of showing that there was *no* advance in value of the Z-beams. This distinction between *Perez* and this case is critical.

What we said concerning clause (a) is applicable to clause (c). That is, all the operations in Mexico constituted assembly of the beams into center sills. Therefore, if increase in value resulted from the activities in Mexico, it was within the exception expressly provided in the statute for advance in value "by being assembled."

We hold that the Customs Court erred in deciding that appellant has failed to establish compliance with clauses (a) and (c) of item 807.00 (TSUS). However, this is not dispositive of the case. Additional issues remain that were briefed but not reached by the Customs Court and therefore were not presented to this court. First, appellant must show that he has complied with the mandatory regulations governing claims for schedule 8, TSUS, classification with respect to 179 of the 400 Z-beams for which appellant has not supplied export declarations. The remaining 221 Z-beams were stipulated at trial to be supported by documentation and were conceded to have originated in the United States. Second, the value of the Z-beams must be established in accordance with headnote 3 of schedule 8, part 1, subpart B.

The judgment of the Customs Court is reversed and the case is remanded for further proceedings consistent herewith.

LANE and MILLER, JJ., dissent.