60 CCPA

**E. DILLINGHAM, INC., Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5487.**

United States Court of Customs and Patent Appeals.
Dec. 29, 1972.

Sharretts, Paley, Carter & Blauvelt, New York City, attorneys of record, for appellant; Gail T. Cumins, New York City, of counsel.

Harlington Wood, Jr., Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Jordan J. Fiske, New York City, for the United States.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

RICH, Judge.

This appeal is from the decision and judgment of the Third Division of the Customs Court, 328 F.Supp. 1392, 67 Cust.Ct. 226, C.D. 4278 (1971), overruling a protest against the classification of papermakers' felts imported from Canada in 1966. There is no dispute about the rate of duty. The sole question on appeal [1] is the amount upon which duty should be assessed. Appellant maintains, pursuant to item 807.00, TSUS, that the merchandise is classifiable as an "assembly" of American components, and should have been assessed with duty upon the value of the imported articles less the cost of the components of United States origin. We affirm in part and reverse in part.

What the Customs Court said on the question whether or not the two components of the felts, fiber and fabric, meet the requirements of item 807.00 was, in its entirety, as follows:

At the time of exportation the massed fibers are not in a condition ready for assembly without further fabrication, and plaintiff's witness McEwan said as much (R. 26, 36). The fibers must be sorted, oiled, carded, and laid out in mats before they are ready for the assembly operation of being needled into the fabric. And these steps take place in the foreign country. The fiber mat which was the product of the carding and not the individual fibers constitutes one of the components of the needled felt. The oiling and opening operations also go beyond the scope of being merely incidental operations.

As for the fabric, while it is ready for the assembly operation in its condition as exported, it is completely obscured from view after the assembly operation is completed, as the result of impregnation of the fabric with the fiber mats. The components of the assembled felts cannot be separated without considerable damage. Consequently, the assembly operation results in a loss of *physical identity, otherwise*, with respect to the fabric, contrary to the requirements of item 807.00.

Item 807.00 reads:

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process

---

1. Appellant's claim below, that the merchandise was properly classifiable under item 806.20, TSUS, as articles exported

for repairs or alterations, has been abandoned on appeal.

such as cleaning, lubricating, and painting ....A duty upon the full value of the imported article, less the cost or value of such products of the United States.

Although the court below did not delineate the specific clauses of item 807.-00 which were found not to be met, we will do so. With respect to the fiber component, the court below clearly found clause (a) unsatisfied because, as stated, the massed fibers were not in a "condition ready for assembly without further fabrication * * *." The court treated, as it must, for reasons which will become apparent, the exported fibers as a component in the condition in which it left the United States as the starting point for analysis of the applicability of the language of clause (a). The court then shifted its analysis to the operations which must be performed on the fibers upon their arrival in Canada, finding that the required sorting, oiling, carding, and laying out of the mats shows that the original massed fibers were not originally exported in condition ready for assembly without further fabrication. Apparently to contradict appellant's arguments that the individual fibers are the "components" which were exported to Canada for assembly abroad, the court made the statement that: "The fiber mat which was the product of the carding and not the individual fibers constitutes one of the components of the needled felt." Finally the court focused upon the "oiling and opening operations," finding these to "also go beyond the scope of being merely incidental operations." The "also" suggests that possibly the court was of the belief that these two operations represented "further fabrication" within clause (a), but the use of the specific term "incidental" operations which appears in clause (c) of item 807.00 and the fact that "oiling" had previously been mentioned by the court lead us to the conclusion that the court was thinking of the latter, in terms of clause (c). The parties seem to have so treated the court's opinion by briefing this issue and we will so treat it here.

Appellant maintains that the fiber *component* of the felts is represented by the *individual fibers themselves*. This would help appellant's argument because each individual fiber does not then appear to be changed or altered by operations such as the "carding," which then, looking only at the fiber, appears to be a mere repositioning thereof. Appellee, on the other hand, seems to maintain that the fiber component is the exported bulk fiber which can hardly be "ready for assembly" within clause (a), since the bulk raw material must be opened by a wool opener to make it fluffy, oil added, and the stock carded. The Customs Court, from the language of the opinion quoted, seems to have adopted an intermediate form of the fiber as the "component" of item 807.00—"The fiber mat which was the product of the carding * * *."

■ We believe that the correct starting point for the application of item 807.00 must be the components as "exported," in the condition in which they leave the United States. The word "components" appears in the introductory clause of item 807.00 and thus a uniform treatment of the word should exist for clauses (a), (b), and (c) thereof. Clause (a) speaks of the components which "were exported" and (c) speaks of improvement "abroad" thus indicating that the condition of a "component" is considered as of its departure from the United States.

The condition of the fiber component upon leaving the United States is best described by looking at the operations performed in the United States immediately prior to exportation. Appellant's witness Barnes described the fiber in the following way:

This fiber was received [in the United States plant] in two conditions; one was raw wool, as purchased, and the other was raw synthetic fiber, as purchased. The raw wool had to first be sorted for grade, then scoured to remove the natural impurities on the

wool. It was then blended in this desired proportion with a quantity of synthetic, in relation to the specifications for this particular blend, mixed together in a machine to blend it, and processing oil to facilitate further processing was added at this point. This material was then baled and shipped to Canada.

■ Appellant argues that for the purpose of applying item 807.00 to the fiber component the *individual* fibers are to be considered as the components of the assembled article. We believe that the fiber must be considered to be a component in the bulk, baled form, *en masse*, in which it left the United States.

Considering item 807.00 clause (a), we must determine whether operations performed on the exported component between its arrival abroad and the assembly, show that the component, as exported, was not "in condition ready for assembly without further fabrication." As we said in United States v. Baylis Bros. Co., 451 F.2d 643, 59 CCPA 9, C.A.D. 1026 (1971), "the term [assembly] is used to describe the joining or coming together of solids" Id., 451 F.2d at 645, 59 CCPA at ——. Accordingly, it is not until the fiber came together with the other component, the fabric, that assembly occurred. The operations performed upon the fiber component before it met up with the fabric include, at least, the opening, oiling, and carding performed upon the fiber component in Canada. Those operations are generally described in the following colloquy between appellant's witness and appellee's attorney on cross examination:

Q. Could you tell me what is done to this material after it is received by you people? A. Yes. We receive the material in bulk, the raw material. It is opened up, to make it more fluffy, wool oil is added—

Q. Does the wool opener have a particular name, like a pick or some-

thing? A. A wool opener is the general term.

Q. Then what do you do with that merchandise after it is put into the wool puller? A. After it is through the wool opener the stock is carded through a carding machine.

Q. And what does the carding machine do to that? A. The carding machine takes this mass of fibers and delivers a sheet type form of uniform density.

Q. Are the fibers straightened or parallelized in this process? A. Yes.

Q. They are both straightened and parallelized? A. Yes.

■ We find the opening, oiling, and carding operations together constitute "further fabrication" of the fiber within clause (a) of item 807.00.[2] Without the performance of these operations, the fiber component was not ready for assembly.

Appellant, treating the individual fibers as components, asserts that:

The operations performed on the fibers in Canada were merely a practical manufacturing expediency designed to position the fibers on a mass basis in desired orientation to permit the handling of a multitude of individual fiber components simultaneously. These operations did not advance the value of the fiber component since no physical or chemical change took place (R. 46) and the component of the needled felt remained the individual fibers, not the fiber mat.

We disagree with appellant's premise that the individual fibers are the "components" of the finished felts. What was exported here was a fiber mass in bulk on which much further labor was expended to put it into the condition required to enable it to be needled into the fabric. Appellant's argument is sophistry.

2. The Customs Court opinion mentions, in addition, that the fibers were "sorted." We agree with appellant that the record does not support the existence of this as a separate operation performed in Canada.

The Customs Court gives this explanation of the joining of the carded fibers with the fabric in the operation known as "needling" and of the resulting product:

> Four layers of this web were needled to the base fabric on a needle loom, which entails a bottom beam and an upper structure containing a needle beam. The needles have rows of barbs on two edges so that as the needle beam is lowered and raised it punches the fibers into the base fabric. After needling, the felts still require further processing in the United States, including washing, trademark insertion, treatment with chemicals and singeing of the surface.

> If, after needling, the merchandise was disassembled the fibers would no longer be in the form of a batt (uniform density layered fibers) and the base fabric would be slightly damaged. The needling process has, also, changed the degree of absorbency and porosity of the base fabric and left it slightly narrower.

Turning to the base fabric, the parties appear to agree that no issue is raised with respect to clause (a) of item 807.00, the Customs Court noting that the fabric "is ready for the assembly operation in its condition as exported," but they argue failure to meet the conditions of clauses (b) and (c).

■■ Taking clause (b) first, appellant asserts, and we agree, that the court seems to have erroneously applied the "constructive segregation" test which was rejected by this court in 1971 in United States v. Baylis Bros. Co., supra. As we said there:

> It is apparent from a consideration of the legislative history of item 807.00 that the phrase "in such articles" was intended to solidify the demise of the "constructive segregation" doctrine which had developed under Paragraph 1615(a) of the Tariff Act of 1930. Under that doctrine, American components assembled into articles abroad were held not to have been advanced

in value if they could be identified and removed from the article without injury to themselves or to the article.

The legislative history makes it equally apparent, however, that Congress did not intend to exclude articles from item 807.00 merely because the American components had undergone some change of form or shape. The test specified in item 807.00 is whether the components have been changed in form, shape, or otherwise to such an extent that they have lost their *physical identity* in the assembled article. The term "physical identity" was used to exclude from item 807.00 those assembled articles whose American components are "chemical products, food ingredients, liquids, gases, powders," and the like.

It is now well-settled that whether, to use the words of the Customs Court, "The components of the assembled felts cannot be separated without considerable damage" is not determinative of the component's satisfaction of 807.00, clause (b). It is understandable that the lower court believed otherwise, since our *Baylis* decision came out after the Customs Court's decision in this case. In harmony with the "demise of the 'constructive segregation' doctrine", *Baylis*, supra, 451 F.2d at 646, it no longer becomes important whether the component is or is not, in the words of the Customs Court, "completely obscured from view after the assembly operation is completed * * *." As we said last term in General Instruments Corp. v. United States, 462 F.2d 1156, 59 CCPA 171, C.A.D. 1062,

> Looking to the statute itself, it is clear that there is nothing in item 807.00 itself which could give rise to a visibility-without-injury test. The word "otherwise" in condition "(b)" does not possess such a clear meaning as to preclude reference to legislative history as an aid to determining the legislative intent. Looking to legislative history, it is our opinion that not only is there no support for the Customs

Court's visibility-without-injury test but that a contrary intent is manifest.

Accordingly, we apply clause (b) of item 807.00 to the fabric component by determining whether or not that component [3] has lost its *"physical identity* in such articles by change in form, shape, or otherwise"* (emphasis supplied).

Apparently conceding that item 807.00 "does not contemplate a test based on whether or not the American part or parts can be removed without injury or can be constructively segregated," appellee asserts that "the best indication of whether assembled components have or have not lost their physical identity in the final article by change in form, shape, or otherwise, is an examination of the article itself" and continues:

> In this case, the fabric was definitely changed; its width was no longer the same; it became completely perforated with holes caused by the barbed needles; and, it became a blend of fabric and fibers. The fabric acquired a new physical identity, namely, it became a "needled" papermakers' felt, and the commercial utility of the fabric, as well as the fibers, was destroyed by the needling process.

■ The question, however, is not whether the fabric was "changed" by assembly to form the article, but whether it has lost its "physical identity in such articles by change in form, shape, or otherwise." Neither the change in the width of the fabric nor its having been "perforated with holes" is loss of physical identity. Further, an examination of the felts reveals that the fabric has not lost its physical identity by having the fibers entwined therein. Certainly the needled *assembly* acquired a "new physical identity" as a papermaker's felt with a new "commercial utility" but this does not necessarily mean that the *component* lost its physical identity. We find that it did not.

■ With respect to clause (c), the Customs Court seems clearly to have assumed that the "needling" operation was an "assembly" within the meaning of that clause. We see no merit in appellee's argument that it is not an assembly because it is a "manufacturing" process. Appellant asserts that since the needling herein is identical to the smocking in *Baylis* "in that it consists solely of the joining together of two solid components in accordance with a predetermined design, it, too, must be an 'assembly' within the purview of Item 807.00 TSUS."

We need not agree with appellant that the process is "identical to smocking," because it is not. While the process is different from the smocking operation in *Baylis*, the needling operation is still "well within the common meaning of the term 'assembly'." *Baylis*, 451 F.2d at 645. Accordingly, we hold that the needling operation is an "assembly" within item 807.00.

All the conditions of 807.00 being met with respect to the fabric component of the papermaker's felts, appellant is entitled to deduct from the full value of the felts to obtain the dutiable value, the cost or value of the fabric component, a product of the United States.

Modified.

---

3. The Customs Court may also have reached the conclusion that the *fiber* component failed to satisfy clause (b) since the court referred to "components," plural. The view we take with respect to the fiber under (a) makes it unnecessary to decide if the fiber did not meet the requirements of (b). However, to the extent that the court below required "constructive segregation" between components, our remarks with respect to the fabric apply equally to the fiber component and the erroneous use of "constructive segregation" or "visability-without-injury" tests.