## GENERAL INSTRUMENT CORPORATION

v.

## UNITED STATES.

### C.D. 4421; Protest Nos. 68/19187–08350–68, etc.

United States Customs Court.
April 30, 1973.

Lincoln & Stewart, Washington, D. C. (Eugene L. Stewart, Washington, D. C., of counsel), for plaintiff.

Harlington Wood, Jr., Asst. Atty. Gen. (Andrew P. Vance and James Caffentzis, New York City, trial attorneys), for defendant.

RICHARDSON, Judge:

The imported articles, the subject of these consolidated actions, consist of black and white television deflection yokes which were exported from Taiwan and classified in liquidation upon entry at the port of New York under TSUS item 685.20 as parts of television apparatus. Plaintiff alleges in the several complaints at bar that certain magnet and lead wire which was utilized abroad in the making of the yokes is entitled to the duty-free treatment specified in TSUS item 807.00.

Since the involved importations span a period when two versions of item 807.00 were in effect, the court deems it appropriate to set forth the provisions of that statute as it was originally enacted in 1963 and as it was amended and in effect in 1967. Item 807.00 as enacted and in effect in 1963 provides for the payment of duty upon the full value of the imported article less the cost or value of products of the United States as to:

Articles assembled abroad in whole or in part of *products of the United States* which were exported for such purpose and which have not been advanced in value or improved in condition abroad by any means other than by the act of assembly . . .. [Emphasis added.]

The merchandise of protests 68/19187 and 68/27567 is governed by this version of the statute.

Item 807.00 as amended by Public Law 89–806 and in effect in 1967 provides for the aforesaid reduced rate of duty as to:

Articles assembled abroad in whole or in part of *fabricated components, the product of the United States,* which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting . . .. [Emphasis added.]

The merchandise of protests 70/13838, 70/22707, and 70/22711 is governed by this amended version of the statute.

By agreement of the parties the consolidated cases at bar are submitted to the court for determination upon the basis of the record evidence adduced during trial in the case of General Instrument Corporation v. United States, 65 Cust.Ct. 648, C.D. 4151 (1970),[1] the parties having stipulated, among other things, that the wire in issue here is of American origin, and is of the same class or kind as the wire which was the subject of trial in C.D. 4151. Thus, two types of wire are in issue here, both of which were exported from the United States to Taiwan on spools.

One type of wire in issue, namely, magnet wire, is used in Taiwan in the making of either horizontal coils or vertical coils found in the imported yokes, depending upon whether or not the magnet wire possesses an outer coating of bonding material. [The magnet wire coated with bonding material is used in the making of horizontal coils.] And the other type of wire is used in Taiwan in the making of the lead wire harness found in the imported yokes.

Plaintiff contends, among other things, that the subject wire constituted "products of the United States" or "fabricated components, the product of the United States", as the case may be, within the meaning of item 807.00 at the time of exportation from the United States. Plaintiff argues that as to the wire the subject of protests 68/19187 and 68/27567 it is sufficient merely to show that such wire was "products of the United States", calling attention to evidence that the wire was a finished, fabricated product of American manufacture when exported to Taiwan. With respect to the wire the subject of protests 70/13838, 70/22707, and 70/22711, plaintiff argues that the fabrication referred to in item 807.00 relates to the state of the wire products in the condition as exported from the United States,

and that since such wire was fabricated in the United States and the condition of fabrication did not change during the manipulation of the wire in Taiwan in the assembly processes there, such wire was fabricated components ready for assembly without further fabrication at the time of exportation from the United States.

Defendant contends that the subject wire is neither "products of the United States" as contemplated by the former item 807.00, nor "fabricated components, the product of the United States" as contemplated by the present item 807.00. Defendant argues that in neither case did the wire, at the time of exportation from the United States, attain the status of fabricated components of the imported yokes.

The essential facts underlying this controversy are not in dispute, and are briefly as follows:

In the first stage of operations abroad wire which is used to make horizontal coils [for purposes of this case identified as No. 1–129A8–68] is despooled from the supply spool and formed into the primary shape of a horizontal coil by a winding machine. The coil is then removed from the winding machine and taped to prevent unraveling of its adjacent turns which at this point adhere to each other by means of the bonding material on its outer surface. After separation from the supply spool, the coil is cement dipped, dried, and precision shaped by machine pressing to fit the contours of a plastic liner on which it is subsequently mounted.

Next, ferrite cores are inserted into the winding machine for the making of vertical coils. The machine is then actuated and wire [for purposes of this case identified as No. 1–251336–34] is despooled from the supply spool and vertically wound around the ferrite cores for a prescribed number of turns. The coils are then separated from the supply spool, removed from the machine, and taped to prevent unraveling of the turns.

---

1. C.D. 4151 was disposed of after a plenary trial solely upon jurisdictional grounds.

In this manner two horizontal coils and two vertical coils are prepared for each yoke with the magnet wire.

Then, an appropriate number of "lead wires" [for purposes of this case identified as Nos. 28–254390–4 and 28–254391–10] are drawn from supply spools and mechanically cut to desired lengths. The ends of the lead wires are mechanically stripped of insulating material for electrical connection purposes. The lead wires are then brought together with a plug assembly, woven into a cable harness, and secured with tape. At this point we have a finished cable harness ready for cementing to a terminal panel.

The foregoing constitute the initial steps taken in Taiwan with the subject wire after its exportation from the United States, culminating in what the evidence describes as second level sub-assemblies.

In the second stage of operations abroad two finished horizontal coils are placed inside two plastic yoke liners and cemented in place. The open faces of the liners are securely taped. Two finished vertical coils are placed outside the liners and secured by means of metal clips. Rubber spacers are then placed between the vertical coils and the liners. The resultant article is a finished basic yoke. The cable harness is cemented to the terminal panel. And these steps complete what is characterized in the evidence as first level sub-assemblies.

In the final operations a plastic insulating ring is laid on top of the basic yoke. The lead wires extending from the vertical and horizontal coils are affixed to the terminal panel. The terminal panel and cable harness are placed over and affixed to the insulating ring. The protruding eyelets on the panel and harness assembly are soldered and a number of ancillary components are attached to the liner. The article is now a finished black and white television deflection yoke in the condition as imported herein.

In the court's opinion both versions of item 807.00 under consideration contemplate the exportation from the United States of "components" of the imported article, as distinguished from mere "products". Although the earlier version of the statute used the word "products", it is clear from the legislative history underlying the original enactment of item 807.00 as well as from cognate statutory language that the words "products of the United States" appearing in the original enactment were intended to apply to components produced in the United States.[2] And the amendment of item 807.00 brought about under the Tariff Schedules Technical Amendments Act of 1965 which introduced the term "fabricated components, the product of the United States" into the statute was for "clarification" purposes—purporting to eliminate certain ambiguities created by language used by the Tariff Commission in drafting the statute which had resulted in administrative problems.[3] Thus, the fundamental question before the court in all five of the instant cases, when item 807.00 is viewed in this perspective, is whether the subject wire was a component of the yoke when exported from the United States.

Plaintiff concedes that each of the wire products at bar was the subject of a "sub-assembly" when first used abroad. Thus, none of these wire products possessed the capacity, at that time, of being employed directly in the assembly of the imported yokes without further fabrication. The instant case is, therefore, brought squarely within the holding of this court in Amplifone Corporation v. United States, 65 Cust.Ct. 58, C.D. 4054 (1970), on the facts. In the *Amplifone* case the imported merchandise consisted of horizontal output

---

2. Tariff Classification Study, Schedule 8, pp. 12–15; headnote 3, subpart B, part 1, schedule 8.

3. H.Rept. 342 on H.R. 7969, 89th Cong., 1st Sess., page 48.

transformers used in the circuitry of television sets. The importer there sought item 807.00 treatment for a number of products of American origin, including spooled magnet wire, which were used abroad in making high- and low-voltage coils for the transformers. In rejecting the importer's claim for item 807.00 treatment in that case the court stated with respect to the products of American origin (p. 63):

. . . they are not in such a state of readiness at the time of exportation as to be capable of being incorporated into the coils, which of course, is not the imported article. In such state, it may well be, for all the record shows, that each of the exported products in issue lends itself to usage for a hundred and one different purposes. In this state these products are at best described as fabricated products. It is only when they are subjected, while abroad in a foreign country, to measuring, cutting, winding, melting, etc., that these products can properly be described as component materials for transformer coils. And it is only after the resultant products are incorporated into the coils that the coils themselves become components in a state of readiness for incorporation into the transformers.

The court concluded in *Amplifone* that the American products in issue did not constitute "fabricated components, the product of the United States".

To the same effect is the decision of this court in General Instrument Corporation v. United States, 67 Cust.Ct. 127, C.D. 4263 (1971), appeal pending in suit number 5480, wherein the court, following the holding in the *Amplifone* case, rejected the importer's item 807.00 claim for certain products of American origin used in Taiwan to produce a capacitor roll which, in turn, was assembled with other components to produce the capacitors imported in that case.

In the instant cases plaintiff urges the court not to follow the ruling in the *Amplifone* case because, according to plaintiff, the court in *Amplifone* misinterpreted the usage by Congress of the words "assembly" and "fabrication" in mutually exclusive senses, and fell into a more restrictive interpretation of the change Congress intended to make in item 807.00.

Plaintiff's contention here would appear to be a "strawman" argument. Not only does the court agree with defendant that there is no legislative history regarding Congressional usage of the words "assembly" and "fabrication" in item 807.00, but the court also finds no indication whatever in the *Amplifone* decision of any undertaking by the court in that case to compare the words "assembly" and "fabrication" with a view toward ascertaining the legislative usage of those words. In fact, the lack of an occasion for such a comparison seems readily apparent. The key word in item 807.00 as amended by Public Law 89–806 is "components"; and the word "fabrication" to which plaintiff calls attention only appears in that context as a modifier of the word "components". Hence, there exists no basis for comparison of any other word in item 807.00 as amended with the word "assembly"—the other word to which plaintiff's argument draws attention—unless it is with the word "components". And it is noted that plaintiff's argument wholly fails to mention or discuss the key word "components" in its assessment of item 807.00 construction.

In the instant cases the court finds that the coils and cable harness which utilized the wire products in issue are the *components* of the imported yokes, along with some others which are not of concern here. The coils and cable harness were produced in Taiwan, and unless and until they were produced, no *assembly* of the yokes could take place. Therefore, on the instant record the court concludes that the wire products at bar did not constitute "components" of the imported deflection yokes at the time of exportation to Taiwan, and elects to follow the holding of the court in the *Amplifone* case in the cases be-

**1394**

fore the court. Consequently, the consolidated actions herein are dismissed, plaintiff having failed to sustain the causes of action pleaded in the several complaints before the court.

Judgment will be entered herein accordingly.