**GENERAL INSTRUMENT CORPO-
RATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5541.**

United States Court of Customs
and Patent Appeals.
June 27, 1974.

Eugene L. Stewart, Washington, D.C., attorney of record, for appellant.

Irving Jaffe, Acting Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, James Caffentzis, New York City, for the United States.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILL-ER, Judges.

BALDWIN, Judge.

This appeal is from the decision and judgment of the United States Customs Court, 70 Cust.Ct. ——, C.D. 4421, 359 F.Supp. 1390 (1973), overruling the importer's protest against the denial of an allowance under item 807.00 TSUS for certain products of the United States constituting parts of black and white television deflection yokes imported from Taiwan. The yokes were classified under the provision for parts of television apparatus in item 685.20 TSUS and that classification is not disputed. We reverse.

The involved importations span a time period when two versions of item 807.00 were in effect. Item 807.00, as it was originally enacted in 1963, reads:

> Articles assembled abroad in whole or in part of products of the United States which were exported for such purpose and which have not been advanced in value or improved in condition abroad by any means other than by the act of assembly ........ A duty upon the full value of the imported article, less the cost or value of such products of the United States
>
> . . . . . . . . .

Item 807.00, as amended by Public Laws 89–241 and 89–806, in effect in 1967 reads:

> Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting ------------------------------ A duty upon the full value of the imported article, less the cost or value of such products of the United States
>
> . . . . . . . . .

---

The merchandise in issue is magnet wire and lead wire, both of which were on spools when exported from the United States to Taiwan. The magnet wire is used for making the horizontal or vertical coils in the imported yokes. The lead wire is used for making the lead wire harness contained in the deflection yokes.

The Customs Court briefly described the initial steps taken in Taiwan with the magnet and lead wire after its exportation from the United States in the following manner.

In the first stage of operations abroad wire which is used to make horizontal coils . . . is *despooled* from the supply spool and *formed* into the primary shape of a horizontal coil by a winding machine. The coil is then removed from the winding machine and *taped* to prevent unraveling of its adjacent turns which at this point adhere to each other by means

of the bonding material on its outer surface. After separation from the supply spool, the coil is *cement dipped, dried,* and precision *shaped* by machine pressing to fit the contours of a plastic liner on which it is subsequently mounted.

Next, ferrite cores are inserted into the winding machine for the making of vertical coils. The machine is then actuated and wire . . . is *despooled* from the supply spool and vertically *wound* around the ferrite cores for a prescribed number of turns. The coils are then separated from the supply spool, removed from the machine, and *taped* to prevent unraveling of the turns.

In this manner two horizontal coils and two vertical coils are prepared for each yoke with the magnet wire.

Then, an appropriate number of "lead wires" . . . are *drawn from supply spools* and mechanically *cut* to desired lengths. The ends of the lead wires are mechanically *stripped* of insulating material for electrical connection purposes. The lead wires are then brought together with a plug assembly, *woven* into a cable harness, and *secured with tape.*

At this point we have a finished cable harness ready for cementing to a terminal panel. (Emphasis added). The coils and harnesses produced are described as "second level sub-assemblies."

The Customs Court held that since "both versions of item 807.00 contemplate the exportation from the United States of 'components' of the imported article, as distinguished from mere 'products' . . . ., the fundamental question . . . is whether the subject wire was a component of the yoke when exported from the United States."

The court found that since the wire products were sub-assembled when first used abroad, they could not be directly employed as components in the assembly of the imported yokes, without further fabrication. Therefore, the court found

the holding of Amplifone Corporation v. United States, 65 Cust.Ct. 58, C.D. 4054 (1970) to be dispositive of the importer's claim and dismissed the importer's protest.

*Opinion*

In the interim period since the Customs Court's decision, this court decided the case of General Instrument Corporation v. United States, C.A.D. 1106, 480 F.2d 1402, 60 CCPA 178 (1973), familiarity with which is presumed, wherein we specifically rejected the rationale of the *Amplifone* case. Appellee, while acknowledging this court's decision in *General Instrument,* asserts that the facts of the present case are distinguishable therefrom and that the rationale of E. Dillingham, Inc. v. United States, C.A.D. 1078, 470 F.2d 629, 60 CCPA 39 (1972) should be applicable to the facts of the instant case.

Citing *Dillingham,* appellee contends that the involved wire was subject to "further fabrication," thus precluding item 807.00 treatment for the imported wire. In *Dillingham,* the importer sought item 807.00 treatment for certain fiber and fabric of which imported papermakers' felts from Canada were composed. The fiber and fabric were products of American origin and the fiber had been sent to Canada in bulk, baled form. Item 807.00 treatment for the fiber was denied because the fiber component, *before being assembled with the fabric,* was subjected to further fabrication comprising the steps of "opening, oiling and carding." It is these operations that appellee asserts are of the same degree as the despooling, cementing, winding, taping, etc., steps performed upon the wire in the instant case, which steps appellee asserts should also be held to constitute further fabrication of the wire components.

 We cannot agree with that assertion. The steps performed upon the wire after its exportation to Taiwan are not "further fabrication" steps, but rather assembly steps within the meaning of item 807.00. We can perceive no

substantial differences between the instant assembly steps and those of *General Instrument* which were held not to constitute "further fabrication." Furthermore, unlike the fiber component in *Dillingham* the instant wire, exported to Taiwan on spools, was capable of immediately entering into the assembly process to make the imported yokes.

As to the other requirments imposed by item 807.00, it should suffice to repeat what we said in *General Instrument*.

> We find that all the articles in issue here meet those requirements. Concededly all are products of the United States and all went into the imported [deflection yokes]. The meaning of "fabricated" is broad and without doubt applies to the [spools of wire] which obviously were manufactured articles. The articles did not lose their physical identity in the [yoke] "by change in form, shape or otherwise." As stated in United States v. Baylis Brothers Co., 451 F.2d 643, 646, 59 CCPA 9, C.A.D. 1026 (1971):

> > The legislative history makes it equally apparent, however, that Congress did not intend to exclude articles from item 807.00 merely because the American components had undergone some change of form or shape. The test specified in item 807.00 is whether the components have been changed in form, shape, or otherwise to such an extent that they have lost their *physical identity* in the assembled article. The term "physical identity" was used to exclude from item 807.00 those assembled articles whose American components are "chemical products, food ingredients, liquids, gases, powders," and the like. [Footnote omitted].

> Since the only changes in the exported articles were "by being assembled" or "by operations incidental to the assembly," the items have not been "advanced in value" . . . .

The decision and judgment of the Customs Court is reversed.