SAMSONITE CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

Court No. 82–10–01383.

United States Court of
International Trade.

Dec. 2, 1988.

Baker & McKenzie, William D. Outman, II, Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice, Kenneth N. Wolf, New York City, for defendant.

OPINION

AQUILINO, Judge:

This action challenges Customs Service denial of a duty deduction under item 807.-

00 of the Tariff Schedules of the United States ("TSUS") for the value of strips of steel worked in Arizona and delivered to neighboring Nogales in Sonora, Mexico for use in luggage imported into the United States.

As exhibited at trial, when they left Tuscon, the strips were straight, approximately 1⅞ inches wide and 55 inches long, with a pair of parallel rolled ridges running length-wise and some fourteen ³⁄₁₆–inch holes drilled along the centerline at specified distances and bearing a protective coat of oil. Their cost or value ranged from 95 cents to $1.26. After arrival at plaintiff's assembly facility in Nogales, the strips were (1) bent by machine into a form analogous to a squared-sided letter C, (2) cleansed of their oil coatings, (3) covered on the in-sides with vinyl sheaths and (4) riveted, on the open out-sides, to 6½ × 15¾–inch sheets of plastic, which thereby became the bottom plates of completed "frame assemblies". These resulting, enclosed, rectangular-shaped assemblies were subsequently placed in, and fastened to, sewn bags of vinyl to form light-weight luggage commonly known now by such terms as "soft-side" or "carry-on".

There is no dispute that Customs correctly classified the models covered by the entry in question under TSUS items 706.6235 and 807.00. Rather, the plaintiff seeks a deduction from the duty paid for the value of the steel strips as "fabricated components, the product of the United States" within the meaning of the latter item. It provides for a "duty upon the full value of the imported article, less the cost or value of ... products of the United States" which

> (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity ... by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

Upon denial of such a deduction, this action ensued.

*Discussion*

The foregoing three conditions for a deduction are set forth in the conjunctive, and it has been held that each must be satisfied before a component can qualify for duty-free treatment. *E.g., The Proctor & Gamble Distributing Company v. United States,* 11 CIT ——, ——, Slip Op. 87–72, at 3 (June 24, 1987).

The first question then is whether the steel strips, which were admittedly fabricated in the United States, "were exported in condition ready for assembly without further fabrication". In *E. Dillingham, Inc. v. United States,* 470 F.2d 629, 632, 60 C.C.P.A. 39 (1972), the court stated that the correct starting point for the application of item 807.00 must be the material or article in question, as exported from the United States. In that case, the court held that the mixed fiber mass at issue, as it left this country, required further labor to put it into the condition of a component ready for assembly, and thus disallowance of a deduction was upheld. In *Zwicker Knitting Mills v. United States,* 613 F.2d 295, 67 C.C.P.A. 37 (1980), the court concluded that stitching to close glove fingers was further fabrication within the meaning of item 807.-00. And in the *Proctor & Gamble* case, *supra,* the court held that creation of an absorbent diaper core from fabricated U.S. dry lap also entailed further fabrication. In reaching that result, the court stated that the "sewing and knitting cases seem to indicate that ... operations are fabrication only if they create the basic article." 11 CIT at ——, Slip Op. 87–72 at 4. *Cf. United States v. Mast Industries, Inc.,* 668 F.2d 501, 69 C.C.P.A. 47 (1981) (buttonholing and slitting pockets in pants not further fabrication).

Of course, neither sewing nor knitting was the process at issue herein, rather placement of four, corner bends in strips of steel. In *Rudolph Miles v. United States,* 567 F.2d 979, 65 C.C.P.A. 32 (1978), the court held that the burning of slots and holes into large steel beams before placement in railway boxcars in Mexico did not amount to further fabrication there. The

opinion refers to three earlier decisions, each *sub nom. General Instrument Corporation v. United States* and reported at 462 F.2d 1156, 59 C.C.P.A. 171 (1972), 480 F.2d 1402, 60 C.C.P.A. 178 (1973), and 499 F.2d 1318, 61 C.C.P.A. 86 (1974). In the first case, the simple cutting to size of wire for placement in a transistor was not held to be further fabrication, nor was such cutting of U.S. components for capacitors in the second case, or for coils in the third. *See also United States v. Texas Instruments Inc.*, 545 F.2d 739, 64 C.C.P.A. 24 (1976) (separation of silicon chips along scored lines not further fabrication).

In the third *General Instrument* case, wire was coiled by means of winding machines, which process involved despooling, forming, cutting, taping and cementing. Here, the plaintiff argues that the "frame-bending operation ... constitutes less fabrication than that expressly permitted by the Court ... in *General Instrument III.*" Plaintiff's Brief, p. 20. In that case, however, wound wire became, in essence, re-wound wire or "capable of immediately entering into the assembly process", to quote from the opinion, 499 F.2d at 1321, whereas in this action plaintiff's straight strips of steel could not have been placed immediately into its bags without the work referred to above.[1] That is, the court finds that the strips were not exported in condition ready for assembly, in contrast, for example, to the steel beams in *Rudolph Miles, supra,* which were not changed in form or shape; only incidental slots and holes were made in them.

Item 807.00 equates "operations incidental to the assembly process" with "cleaning, lubricating, and painting." A regulation of Customs states that components, the product of the United States "will not lose their entitlement to ... exemption by being subjected to operations incidental to the assembly", 19 C.F.R. § 10.14(a), while another regulation, § 10.16(b), provides examples of such operations as follows:

(1) Cleaning;

(2) Removal of rust, grease, paint or other preservative coating;

(3) Application of preservative paint or coating, including preservative metallic coating, lubricants, or protective encapsulation;

(4) Trimming, filing, or cutting off of small amounts of excess materials;

(5) Adjustments in the shape or form of a component to the extent required by the assembly being performed abroad;

(6) Cutting to length of wire, thread, tape, foil, and similar products exported in continuous length; separation by cutting of finished components ...; and

(7) Final calibration, testing, marking, sorting, pressing, and folding of assembled articles.

The parties herein do not dispute the nature of the removal of the oil coatings, the encasement of the metal in vinyl and the attachment of the bottom plates. Rather, they have stipulated the issue to be whether the bending of the strips was an incidental operation. On its part, the plaintiff argues that the bending was a "mere adjustment in shape" of the kind contemplated by subsection (5), *supra.*

The court finds on the record before it that the bending process did more than "adjust" the article. The process created the component to be assembled, the essence of which is its configuration. Without the resultant shape, the plastic plate could not be attached so as to constitute the bottom, and the completed frames[2] could not be inserted into plaintiff's bags, thereby imparting the intended overall form and structural stability of the finished luggage.

The court concludes that item 807.00 and the attendant regulations do not cover a process which was as necessary to the fa-

---

1. *See, e.g.,* trial transcript ("Tr."), pp. 42–43. *Compare* Plaintiff's Exhibit 1 *with* Plaintiff's Exhibit 7.

2. From the beginning, the plaintiff has sought to characterize the steel, whether in strip or bent form, as the "frame". The evidence shows, however, that the metal in its final form and the attached bottom plate, together, comprise the frame. Indeed, the court notes in passing that that term generally connotes enclosure or unity.

brication of the component as it was to subsequent assembly thereof. In fact, 19 C.F.R. § 10.16(c) provides that

[a]ny significant process, operation, or treatment other than assembly whose primary purpose is the fabrication, completion, physical or chemical improvement of a component, ... whether or not it effects a substantial transformation of the article, shall not be regarded as incidental to the assembly and shall preclude the application of the exemption to such article.

The plaintiff attempts to equate "incidental" with "insignificant" and thereby argues that the bending process was a minor one allowable under item 807.00. In support of its position, the plaintiff has shown that the bending by machine took some 1.4 percent of the total time required for the assembly process and reflected but 1.5 percent of the value of the frame. *Cf.* Tr. at 56–63.

The magnitude of a particular process in terms of time and cost, however, does not make that process any less one of fabrication, nor does it make the result thereof any less significant. In *United States v. Oxford Industries, Inc.,* 668 F.2d 507, 511 n. 11, 69 C.C.P.A. 55 (1981), the court cautioned that cost is but one factor to be considered when making a determination under item 807.00. In *Mast Industries, supra,* the court of appeals pointed to three factors in analyzing procedures claimed to be incidental. It looked at time and cost, as well as at whether the procedure in question was considered "necessary" in the assembly process. Thirdly, the court considered whether the procedure was "so related" to the assembly that it was "logically performed" with it. *See* 668 F.2d at 506.

Here, logic does not necessarily link the bending of the steel to the process of assembly of the luggage, even though the product could not have been assembled without the strips having been bent. In fact, prior to April 1982, the bending was performed in the United States[3], wholly separate from the assembly process in Mexico. Wherever, the bending was more a part of the fabrication of the steel frames than of the assembly of the merchandise. As the court of appeals concluded in *Zwicker, supra,* where the finishing of gloves was found to be further fabrication, that process begun in the United States and completed abroad could not be "incidental to the assembly process".

### Conclusion

To summarize, the bending in question was not incidental to assembly of a fabricated component exported from the United States in condition ready for assembly without further fabrication. The presumption of correctness that attached to the denial of plaintiff's protest by the Customs Service stands, and judgment must therefore enter in favor of the defendant.

---

**3.** *See* Stipulation of Agreed Statement of Facts, para. 9 and Plaintiff's Exhibit 2; Tr. at 42.