**GENERAL MOTORS CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 87–03–00471.**

United States Court of
International Trade.

July 23, 1991.

Ross & Hardies, Joseph S. Kaplan and Michelle F. Forte, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Saul Davis, Sr. Trial Counsel, of counsel), Stephen Berke, Atty., U.S. Customs Service, Washington, D.C., for defendant.

## OPINION

TSOUCALAS, Judge:

Plaintiff, General Motors Corporation ("GM"), initiated this action to challenge denial of a protest seeking item 807.00, Tariff Schedules of the United States ("TSUS"), allowances for certain domestic automobile components exported for assembly. Plaintiff avers that Customs improperly withheld the tariff adjustments because all the item 807.00, TSUS, requirements were fulfilled.

Defendant maintains that GM's petition for item 807.00, TSUS, treatment was properly denied because, in the course of the painting process, the American made components were substantially advanced in value or improved in condition in a manner that was neither minor nor incidental to assembly. Defendant supports this position by noting that pertinent cost and time comparisons demonstrate that the painting operations constitute a substantial fraction of total cost and assembly time and cannot be deemed minor and the painting operations could have readily been performed upon re-entry in the United States and therefore can not be considered incidental to assembly.

The Court, after thorough examination of the applicable law, and having carefully considered the body of evidence put forth by the parties, finds that plaintiff has adequately established the eligibility of its products for preferential tariff treatment pursuant to item 807.00, TSUS. Hence, Customs is directed to reliquidate plaintiff's entries and grant item 807.00, TSUS, allowances for the components denied such treatment due to the contested painting operations.

## Background

The merchandise at issue consists of stamped sheet metal automobile components manufactured by GM in the United States and then exported to Mexico, between 1986 and 1987, for assembly into operable motor vehicles. Upon completion, the automobiles were reentered into the United States for ultimate sale wherein plaintiff sought a tariff allowance for the value of the exported components in accordance with item 807.00, TSUS. Although some allowances were granted,[1] Customs denied allowances to all components that had undergone finish painting (pigmented topcoating) because "[f]inish painting vehicle parts is not of such a minor nature as to be considered incidental to the main assembly process" and "[i]f performed abroad, finish painting amounts to a fabrication that advances the vehicles in value and condition, beyond the meaning of [item 807.00]." *Treasury Ruling Letter 553340 (Joint exhibit 2)*.

Plaintiff subsequently commenced the instant action to challenge Customs' denial of item 807.00, TSUS, allowances for components that underwent topcoating during the assembly process. Trial was commenced in August, 1990, before Chief Judge Re. Subsequent to trial, Chief Judge Re retired from the Court and this case was reassigned to Judge Tsoucalas.

Among the witnesses that testified at trial were Mr. Robert Stramy, manager of the Ramos Arizpe plant during the time at issue, testifying on plaintiff's behalf, and Mr. Steven Pinter, a Customs law specialist employed in the Office of Regulations and Rulings at Customs headquarters, who testified for defendant.

The evidence adduced at trial indicates that the prefabricated automobile components were transported to plaintiff's Ramos Arizpe plant via rail car, where they arrived immediately ready for manufacture into motor vehicles. *Transcript ("TR")* at

---

**1.** The parties are in agreement that components that had undergone assembly and various other miscellaneous operations, but had *not* undergone finish painting operations, were granted item 807.00, TSUS, treatment.

20–21. Assembly was performed in five general operation groups: body shop, paint shop, chassis line, trim shop and final process. *Plaintiff's Exhibit* ("Pl.Ex.") 3.

In the body shop, various major component subassemblies were fitted together and spot welded to create the carcass or body of the automobile. Mr. Stramy illustrated for the Court the complexity of the operations effected in the body shop, adding that this department not only contained the most complicated equipment but was also the most labor intensive. TR at 22–31. As explained by the witness, when the fitting and welding operations are completed, the partially assembled body travels via an overhead conveyor to the next operations group, the paint shop. TR at 31–32.

Upon arrival in the paint shop, the body is cleaned and sprayed with a protective zinc phosphate compound. Next, to further retard corrosion, the entire body is submerged in an electro deposition primer tank ("Elpo tank"), and then baked, sanded, treated with a sealant and baked again. TR at 32–33; *Pl.Ex.* 3B. This is followed by an application of surface primer. At this point topcoat application occurs and the body is oven cured. TR at 34. Finally the body is waxed and sent along to the trim shop. *Id.*

Once in the trim shop, the body undergoes all electrical wiring as well as the installation of the steering column, the gearshift lever and the instrument panel. Also installed while in the trim shop are the front and rear windshields, after which the body is inserted in the "water test booth" where intense rain conditions are simulated to detect any leakage problems. TR 34–36. After the water test booth, the carpets, seats, and moldings are positioned and the body is conveyed to the chassis shop.

The chassis shop is responsible for preparing the completed body for marriage to the engine and chassis frame. While the radiator, grille and gas tank are attached to the body, the engine, transmission, and frame are independently subassembled on a separate conveyor. Then the body and frame are joined. *Pl.Ex.* 3D; TR 36–37. Once this operation is completed, bumpers are positioned, radiator and transmission fluids are added and tires are installed before the vehicle is rolled to final process.

Final process is the last operations group in the assembly process. It consists mainly of manual detail work, sundry inspections, wheel alignments and drive tests. *Pl.Ex.* 3E. Once the vehicles have completed final process, they are driven to the shipping lot to await importation back to the United States.

At trial, plaintiff established that the total cost for the manufacture and assembly of one automobile was \$7,127.42. *Pl.Exs.* 44, 45, 50, 51, and 52, collectively; *see also Plaintiff's Appendix* C. Of this sum, \$763.47 is attributed to the cost of the affected components, *i.e.* (body-in-white), including freight charges and cost of assembly. *Pl.Ex.* 45, 48, 51, and *Defendant's Exhibit* C, collectively; *see also Plaintiff's Appendix* B. Moreover, plaintiff's records further indicated the total time expenditure for assembly of a vehicle is approximately 39.43 standard labor hours ("SLH"). *Pl. Ex.* 45. By way of contrast, the total time allocated to paint shop activities is 7.57 SLHs per assembled body, with only 3.63 SLHs devoted exclusively to topcoating operations. *Pl.Ex.* 46. Finally, total cost of paint shop operations is \$113.70, \$54.53 of which is attributed solely to topcoating. *Id.; see also Plaintiff's Appendix* A.

### Discussion

■ As is by now well established, Customs' classifications are presumed to be correct. 28 U.S.C. § 2639(a)(1) (1982). Therefore, in order to prevail, the party challenging said decision must overcome this presumption of correctness and affirmatively prove proper classification. *Id.; Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 787 (Fed.Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988). The same criterion applies for tariff allowance eligibility claims.

■ American goods that are exported solely for the purpose of assembly are afforded special duty allowances under the TSUS. Item 807.00, TSUS (1986), provides:

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting

shall be dutiable at the full value of the imported article, minus the cost of such products of United States origin. Thus, in order to qualify for item 807.00, TSUS, allowances, a party must satisfy *each* of the aforementioned conditions. *Samsonite Corp. v. United States*, 12 CIT 1146, 1147, 702 F.Supp. 908, 909 (1988), *aff'd*, 889 F.2d 1074 (Fed.Cir.1989); *Proctor & Gamble Distrib. Co. v. United States*, 11 CIT 450, 451, 1987 WL 13264 (1987).

■ In the instant action, defendant concedes that plaintiff's components were ready for assembly as exported (item 807.-00(a)), and have not lost their physical identity within the finished product (item 807.-00(b)). The Court's analysis, therefore, is limited to whether the components have been advanced in value or improved in condition except by assembly and operations incidental thereto (item 807.00(c)). More precisely, the controversy centers around whether certain painting operations effectuated during the assembly process should be deemed permissible as "incidental to assembly."

The question of what can be deemed "incidental to assembly" is not new to our court. Indeed, the court has had ample occasion to, and taken great care in, delineating the range of operations to be regarded "incidental to assembly." *See, e.g., United States v. Mast Indus., Inc.*, 69 CCPA 47, 668 F.2d 501 (1981); *United States v. Oxford Indus., Inc.*, 69 CCPA 55, 668 F.2d 507 (1981); *Miles v. United States*, 65 CCPA 32, C.A.D. 1202, 567 F.2d 979 (1978); *E. Dillingham, Inc. v. United States*, 60 CCPA 39, C.A.D. 1078, 470 F.2d

629 (1972); *Samsonite*, 12 CIT 1146, 702 F.Supp. 908; *L'Eggs Prods., Inc. v. United States*, 13 CIT ——, 704 F.Supp. 1127 (1989); *Surgikos, Inc. v. United States*, 12 CIT 242, 1988 WL 24664 (1988); *Zwicker Knitting Mills v. United States*, 82 Cust. Ct. 34, 469 F.Supp. 727 (1979), *aff'd*, 67 CCPA 37, 613 F.2d 295 (1980); *Baylis Bros. Co. v. United States*, 64 Cust.Ct. 256, C.D. 3987 (1970), *aff'd*, 59 CCPA 9, C.A.D. 1026, 451 F.2d 643 (1971).

In these instances, the court often has referred to the legislative history of item 807.00, TSUS, for assistance in determining what "Congress intended to be considered 'incidental to the assembly process.'" *Zwicker*, 82 Cust.Ct. at 47, 469 F.Supp. at 736; *accord*, *Mast*, 69 CCPA at 53, 668 F.2d at 505; *Oxford*, 69 CCPA at 60, 668 F.2d at 510. In so doing, it has construed Congress' objective to "permit duty-free treatment of a component manufactured in the United States if subjected to an operation 'of a minor nature.'" *Id.*

Specifically, the legislative history of item 807.00, TSUS, chronicles modifications made to the allowance provision and explains the reasons for the changes. "It appears that under the language of item 807.00 minor operations such as painting incidental to assembly abroad may be precluded, and that in certain respects the item is ambiguous." H.R.Rep. No. 342, 89th Cong., 1st Sess. 48.

In a further attempt to "facilitate interpretation and to remove doubt as to the operations that were deemed 'incidental to the assembly process,'" Congress provided as "specific examples operations 'such as *cleaning, lubricating,* and *painting*'." *Zwicker*, 82 Cust.Ct. at 48, 469 F.Supp. at 737 (emphasis in original). These miscellaneous operations, Congress recognized, albeit not part of the assembly process, are often inextricably related to it.

It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. For example, in fitting the parts of a machine together, it may be necessary to remove rust; to remove grease, paint, or other

preservative coatings; to file off or otherwise remove small amounts of excess material; to add lubricants; or *to paint* or apply other preservative coatings.... Such operations, if of a minor nature incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad.

H.R.Rep. No. 342, 89th Cong., 1st Sess. 49 (emphasis added).

The Senate Finance Committee elaborated further with reference to their purpose in effecting the proposed changes. The Committee noted that the bill was intended to "(1) clarif[y] the type of articles which may be exported for assembly and then reimported; and (2) *enlarge[ ] the class of activities which may be performed abroad* without subjecting the U.S. product to duty." S.Rep. No. 530, 89th Cong., 1st Sess. 34, *reprinted in,* 1965 U.S.Code Cong. & Admin.News 3449 (emphasis added).

In *Zwicker,* the court considered the examples provided by Congress in determining that the operation at issue therein, the fingertipping of knit glove shells, was "clearly not *ejusdem generis* with 'cleaning, lubricating, and painting.'" 82 Cust. Ct. at 48, 469 F.Supp. at 737. The court went on to explain that the fingertipping operations could not be considered minor because they constituted "a critical step *prior* to assembly" without which further assembly could not occur. *Id.* (emphasis added).

By contrast, the operation at issue herein is clearly *ejusdem generis* with Congress' examples. Indeed, it is *eo nomine* one of those examples. Moreover, unlike the fingertipping operations involved in *Zwicker,* which were a prerequisite to assembly completion, the painting operation at issue here is not critical to complete the assembly of the affected components. This is best evidenced by the fact that the affected components are already assembled *before* they undergo the painting operations.

In two later cases, *Mast* and *Oxford,* our appellate court was required to determine whether certain buttonholing and pocket-splitting operations performed during assembly were properly deemed "incidental to assembly." 69 CCPA 47, 668 F.2d 501; 69 CCPA 55, 668 F.2d 507. Here again the court had to extrapolate whether the challenged operations were of the sort Congress considered of a minor nature and incidental to assembly. While contemplating Congress' examples of permissible operations, the court noted that "the statute sets forth painting of a component as an example of permissible operations incidental to assembly. It is difficult to visualize a situation where the sole purpose of painting would be to facilitate assembly, or even where painting would be essential to the assembly process." *Mast,* 69 CCPA at 53, 668 F.2d at 505.

The court in *Mast* and *Oxford* went on to specify various relevant factors which should be considered to determine whether the challenged operations were "incidental to assembly" and minor in nature. Among the factors examined were: (a) whether the cost of the challenged operation was substantial relative to the cost of the affected components, (b) whether the time required to perform the challenged operation was significant relative to the time required for assembly of the entire article, and (c) whether the operation was so related to the assembly process that it would "logically [be] performed during assembly." *Mast,* 69 CCPA at 54, 668 F.2d at 506; *accord, Oxford,* 69 CCPA at 60, 668 F.2d at 511.

While defendant acknowledges that the standards enunciated in *Mast* are squarely applicable here, it maintains that the relevant comparison should be between the cost and time expenditure of the *entire* paint shop operations versus the cost and time expenditure of the affected components. This suggestion implies either an erroneous interpretation of the guidelines set forth in *Mast,* or a misunderstanding of the challenged operations. The *Mast* court unambiguously stated that it compared the "cost of the [challenged] operation relative to the cost of the affected component and the time required by the operation relative

to the time required for assembly of the whole article." 69 CCPA at 54, 668 F.2d at 506.

With reference to what operations are "challenged", there is no doubt that all of the operations performed in the paint shop are *not* at issue herein. Customs itself noted in its rulings that the preservative coating operations that make up the rest of the paint shop operations were in conformity with the spirit of item 807.00. Therefore, for defendant to now demand the use of cost and time figures of *all* paint shop operations when performing *Mast* comparisons is irrational. Only the figures directly attributed to the challenged finish painting operations will render a truthful computation of whether the operation is indeed of a minor nature.

Applying the *Mast* criteria to the case at bar, the Court finds that the cost of topcoating is but a fraction, *i.e.* 14%, of the cost of the affected components. In addition, the time expended in the topcoating operations accounts for less than four SLHs out of a total assembly time of over thirty-nine SLHs. Finally, with respect to the "logical relation to assembly" standard, plaintiff has painstakingly demonstrated that for reasons of economics as well as design, the topcoating operation is most logically performed during the assembly process. *See Plaintiff's Post Trial Brief* at 8–14. Hence, it would appear upon execution of the appropriate cost and assembly time comparisons, which our appellate court has sustained time and again, that the topcoating operation challenged herein is precisely the type of minor operation which Congress intended to be considered "incidental to assembly."

Customs, nevertheless, urges that total body finish painting is not encompassed by item 807.00(c). Instead, defendant maintains, the term "painting" in item 807.00(c) is limited to only protective coatings and slight repair painting. In support of this position, Customs points to a longstanding agency practice embodied in its regulations and reminds the Court that great deference should be afforded to the statutory interpretation adopted by the administering agency.

The regulation Customs refers to is 19 C.F.R. § 10.16 (1986) which states:

(c) *Operations not incidental to the assembly process.* Any significant process, operation, or treatment other than assembly whose primary purpose is the fabrication, completion, physical or chemical improvement of a component, or which is not related to the assembly process, whether or not it effects a substantial transformation of the article, shall not be regarded as incidental to the assembly and shall preclude the application of the exemption to such article. The following are examples of operations not considered incidental to the assembly as provided under item 807.00, Tariff Schedules of the United States (19 U.S.C. 1202):

(1) Melting of exported ingots and pouring of the metal into molds to produce cast metal parts;

(2) Cutting of garment parts according to pattern from exported materials;

(3) Painting primarily intended to enhance the appearance of an article or to impart distinctive features or characteristics;

(4) Chemical treatment of components or assembled articles to impart new characteristics, such as showerproofing, permapressing, sanforizing, dying or bleaching of textiles;

(5) Machining, polishing, burnishing, peening, plating (other than plating incidental to the assembly), embossing, pressing, stamping, extruding, drawing, annealing, tempering, case hardening, and any other operation, treatment or process which imparts significant new characteristics or qualities to the article affected.

Defendant apparently operates under the impression that Congress intended the term "paint," as used in the examples to item 807.00, TSUS, to mean exclusively "preservative paint or coating, including preservative metallic coating, lubricants, or protective encapsulation." 19 C.F.R. § 10.-16(b)(3). However, defendant's only sup-

port for this contention is found in its own regulation and the testimony of Mr. Pinter who was involved in the drafting of 19 C.F.R. § 10.16. In light of the significant authority refuting defendant's position, such scant evidence will not suffice.

■ It is a general rule that statutory terms are presumed to have their common or dictionary meanings. *Brookside,* 847 F.2d at 789. Accordingly, one who argues otherwise must prove that something other than the common or dictionary meaning was intended. *Id.,* (citing *Rohm & Haas Co. v. United States,* 727 F.2d 1095, 1097 (Fed.Cir.1984)).

■ Dictionaries and other lexicons are proper sources for the court to consult when determining a term's common or commercial meaning. *Austin Chem. Co., Inc. v. United States,* 835 F.2d 1423, 1426 (1987). Paint is defined in *Van Nostrand's Scientific Encyclopedia* 2117 (7th ed. 1989) as a

> term[ ] used to describe a wide variety of materials designed to adhere to a substrate and act as a thin, plasticlike layer. Paints are available for decorative, protective and other purposes. They can be decorative by covering defects (being opaque), by changing color, or by providing a desired gloss or sheen. Protective uses include shielding metals from corrosion, protecting plastics from degradation caused by ultraviolet light, acting as a moisture barrier and providing mar and scratch resistance for wood or plastic surfaces.

Other lexicographic sources characterize paint as a "substance consisting of a solid colouring matter dissolved in a liquid vehicle, as water or oil, used to impart a colour by being spread over a surface; also applied to the solid colouring matter alone," *The Oxford English Dictionary* 69 (2d ed. 1989), and as a "mixture of a pigment and a suitable vehicle (as oil, water) that together form a liquid or paste that can be applied and spread (as with a brush, spray gun, roller) to a surface so as to form a thin closely adherent coating that dries opaque and imparts color to the surface and that is often designed to protect the surface (as against weathering)." *Webster's Third New International Dictionary* 1621 (1981).

Defendant has not offered, nor has the Court found, anything in the statutory provision, the legislative history, or the various lexicons, to support the premise that Congress intended to restrict the meaning of the term paint. In fact, all definitions of the term, while acknowledging the protective qualities of paint, underscore the aspects relating to pigmentation. Moreover, all the sources consulted noted that *all* paint, regardless of pigmentation, by its very nature functions as a protective coating. Given the ultimate use of the merchandise in this case, the Court has no doubt that the protective qualities of the topcoating operation are significant.

Under these circumstances, the Court is not inclined to infer words of limitation where Congress has so specifically omitted them and has in addition expressed an intent that the provision serve to "enlarge[ ] the class of activities which may be performed abroad" without precluding item 807.00 eligibility. S.Rep.No. 530, 89th Cong., 1st Sess. 34, *reprinted in,* 1965 U.S.Code Cong. & Admin.News 3449.

■ Finally, with respect to the long-standing administrative practice, the Court is well aware and need not be reminded that the administrative agency is often better equipped to interpret nuances in the statutes they are charged with administering. Accordingly, implementing regulations are consulted when the court seeks to construe ambiguous statutes. This notwithstanding, it is fundamental that longstanding administrative practice, if contrary to the plain and unambiguous meaning of the statute, will not attain legal propriety simply because it has been revered. *C.J. Tower & Sons v. United States,* 44 CCPA 41, 44 (1957). Indeed, "it is axiomatic that when a tariff statute [is] construed by the court, it is the judicial decision and not the administrative practice which is controlling." *L'Eggs Prods.,* 13 CIT at ——, 704 F.Supp. at 1133. Therefore, while the agency's understanding of statutory intent is often a valuable source

of insight for the court to draw upon, it cannot be mechanically equated with legislative intent or, for that matter, be deemed automatically binding on this Court.

Hence, the Court finds plaintiff has met the burden of proving eligibility of its products to item 807.00 treatment. The finish painting operations performed abroad are, by the criteria established by caselaw, minor and clearly subordinate to the assembly process. Moreover, any advancement in value or improvement in condition of the components clearly results from an operation which is "incidental to assembly." Therefore, the Court finds that since all the prerequisites for item 807.00, TSUS, treatment of the components at issue have been fulfilled, plaintiff's entries qualify for the tariff allowances. So ordered.