**NASSAU SMELTING AND REFINING CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 82–09–01341.**

United States Court of International Trade.

Nov. 7, 1989.

Grunfeld, Desiderio, Lebowitz & Silverman, (Steven P. Florsheim, New York City) for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Attorney–in–Charge, International Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, New York City (Jerry P. Wiskin) for defendant.

## Opinion

AQUILINO, Judge:

In this action, the plaintiff wholly-owned subsidiary of the Western Electric Company, itself such a subsidiary of the American Telephone and Telegraph Company, challenges the denial by the U.S. Customs Service of a duty exemption for copper from scrap telephone cables allegedly returned to the United States in cathodes of that metal from Canada. Upon entry, the merchandise was classified under item 612.06, TSUS ("Unwrought copper ....... Other"), with duties assessed thereon at 0.8 cents per pound of copper content.

### I

Plaintiff's complaint is not with the classification, but rather with the Service's refusal to take TSUS item 806.30 into account. That item provided for a duty upon the value of processing outside the United States for:

Any article of metal (except precious metal) manufactured in the United States or subjected to a process of manufacture in the United States, if exported for further processing, and if the exported article as processed outside the United States, or the article which results from the processing outside the United States, is returned to the United States for further processing.

In other words, according to the plaintiff, only the value of the foreign processing of the copper should have been subjected to assessment of duties in view of the following underlying facts and circumstances.[1]

Upon removal from service, Western Electric telephone cables made in this country and comprised of copper wire insulated with paper and encased in a lead sheath were cut to short lengths and placed in a furnace, which melted the lead away and burned the paper off, leaving "ashy" wire, approximately 96 percent pure copper. This wire was shipped to an independent refinery in Canada, where, as described by the plaintiff, it was

placed in an anode furnace for the purposes of melting the copper and the removal of certain impurities. The "charge" for the furnace includes copper materials from sources other than plaintiff, and also includes a certain amount of copper left over from the previous charge.... Because of the size of the anode furnace and the fact that a portion of the previous charge is present in the furnace, it is commercially and practically impossible to process only plaintiff's copper in one given charge....

... [T]he resulting molten copper is molded into copper anodes ..., [which] are then removed to a "tank house" wherein the anodes are subjected to an electrolytic process, resulting in copper cathodes—rectangular shapes of 99.95% pure copper. Specifically, the anodes and certain "starter" cathode sheets are placed in a large tank containing sulfuric acid. An electrical current is applied. Over a period of time, pure copper "migrates" from the anodes to the cathodes, and impurities fall to the bottom of the tank. When the cathodes reach a certain size, they are removed. The remainder of the anodes are fed back into the anode furnace....

The copper cathodes were than imported back into the United States by plaintiff, and shipped to Western Electric's Hawthorne Works ... [to be] formed into continuous cast copper rod, and, ultimately, at this or another Western Electric facility, into copper wire....[2]

---

1. The parties have interposed cross-motions for summary judgment, each believing it is entitled to judgment without trial. After review of the motions, the court concludes that they set forth adequate grounds for final disposition of the action, as there are no material facts as to

which there exists a genuine issue to be tried within the meaning of CIT Rule 56.

2. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment [hereinafter

As indicated, in plaintiff's view, this geographic, metallurgic avenue to copper conductor entitled it to demand enforcement of item 806.30.

## II

Enforcement of that item has been governed by 19 C.F.R. § 10.9, subsection (a) of which provided at the times of exit and entry:

> Before the exportation of articles subject, on return to the United States, to duty on the value as provided for in item 806.30, a certificate of registration (top portion of Customs Form 4455), shall be filed (in an original only), by the owner or exporter with the District Director of Customs at a time prior to the departure of the exporting conveyance which will permit an examination of the articles....

Subsection (c) provided that, after endorsement by Customs of the report of the examination of the merchandise on the Form 4455, it was to be returned to the exporter "for use in connection with the return of the articles." In accordance with subsection (f), that form certificate of registration was then to be filed with the Service in connection with the entry, plus a declaration by someone "having knowledge of the facts that the articles entered in their processed condition are the same articles covered by the Certificate of Registration."

█ It is conceded that the foregoing procedure was not followed for the merchandise at issue in this action. That is, at a minimum, the requisite forms 4455 were not filed with Customs. The plaintiff argues that their filing was waived by the

Service for all of the entries. The defendant admits waiver (pursuant to 19 C.F.R. § 10.9(i) (1978) [3]) as to one entry, but not in regard to any of the others.[4] The plaintiff does not prove otherwise as to them. Rather, counsel argue that waiver for one makes "it ... obvious that the production of the Form 4455 was waived for all entries".[5]

The court cannot concur. Not only is a basis for this contention not obvious from the facts presented, the general rule is that an importer must produce all required information and documentation for each entry of merchandise, to assist Customs in reaching a proper determination, and waiver of that basic requirement is on an individual basis only. Of course, this does not mean that exceptions are not made to the general rule, just that the plaintiff has failed to show that any were made for its other entries.[6]

## III

With waiver established at least in regard to one of its entries, however, the plaintiff claims that the

> basic underlying issue ... is whether 806.30 treatment can be afforded to an imported intermediate metal product (copper cathodes) where such product may contain the identical fungible metal (copper) from sources other than that which was exported from the United States. The Government argues that the subject cathodes were produced from "substituted" copper, and that TSUS

---

"Plaintiff's Memorandum"], pp. 7–8 (citations omitted).

**3.** According to this subsection, if

the district director concerned is satisfied, because of the nature of the articles or production of other evidence, that the articles are imported in circumstances meeting the requirements of item 806.30 and related headnotes, he may waive the declaration provided for in paragraph[ ] ... (f) of this section.

**4.** *See* Reply of the United States, Defendant, to Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment, pp. 1–2 and Exhibit A thereto.

**5.** Plaintiff's Memorandum of Law in Opposition to Defendant's Cross–Motion for Summary Judgment [hereinafter "Plaintiff's Reply"], p. 5, n. 1.

**6.** The court notes in passing that defendant's Exhibit A (covering the entry conceded by the government) clearly indicates that production of the missing documents was "waived", whereas its Exhibit B (for another numbered entry at issue herein) bears no such endorsement for the "documents not produced".

item 806.30 does not permit *"substitution."* [7]

■ Item 806.30 applied to any article of metal manufactured or subjected to a process of manufacture in the United States. The court finds that the ashy wire was such an article and also that that article was exported from this country for further processing.[8] As for the remaining requirement of item 806.30 that an article be returned for further processing here, the defendant denies that the cathodes satisfied it, to wit:

... [T]he processing performed in Canada transformed copper scrap into a new and complete article of commerce which was the completion of the processing of the cooper [*sic*] scrap. The resultant cathodes are a final product not an advanced material. Accordingly, the imported cathodes are not eligible for item 806.30, TSUS, treatment.[9]

Here again, the facts presented control, and they indicate importation of the cathodes for further, final processing at Western Electric. Thus, the remaining requirement was met by the plaintiff if its article of metal which was exported was that article subsequently imported.

The defendant denied plaintiff's protest, apparently primarily due to lack of conviction that the copper sent to Canada was actually incorporated and identifiable in the cathodes. On its part, the plaintiff does not gainsay commingling or even complete substitution [10] of copper from other sources. Plaintiff's statement of facts as to which it contends there is no genuine issue to be tried concedes that its wire was melted in the anode furnace "along with scrap copper from sources other than plaintiff's, copper materials generated in prior refining operations, and some copper from previous furnace charges" [para. 7]; that the "mixing of various sources of copper in the anode furnace ... is the only commercially practicable procedure by which the subject merchandise could be processed" [para. 10]; and that it is "commercially impossible to process scrap copper in an anode furnace, where the charging material is obtained from only one source" [para. 11]. The anode furnace had a capacity of some 700,000 pounds of material, including the residue of the previous charge. The defendant points out that annual cathode output of the refinery was 900,000,000 pounds, whereas the plaintiff shipped only 4.8 million pounds of ashy wire during the period under consideration. Nevertheless, the plaintiff contends that

[i]t is of no moment that the same molecule that plaintiff shipped to Canada was not necessarily the exact same molecule that was returned [11]

and also that

nothing contained in the language of TSUS item 806.30, nor the legislative history thereto, prohibits the mixture of metal source material during the foreign processing operation. Defendant's proposed limitation is unsupported by the statute and the legislative history.[12]

Beginning in 1914, the doctrine of "constructive segregation" developed to deal with U.S. goods incorporated in imported foreign merchandise. *See, e.g., Denike v. United States*, 5 Ct.Cust.Appls. 364, T.D. 34553 (1914); *Parrot v. United States*, 40 CCPA 8, C.A.D. 490 (1952); *United States v. Oakville Company*, 402 F.2d 1016 (CCPA 1968); *C.J. Tower & Sons v. United States*, 33 Cust.Ct. 14, C.D. 1628 (1954). The test was whether such goods could be removed from the imports "without injury", or whether they had somehow been improved in value or otherwise changed by

---

7. Plaintiff's Reply, p. 1 (emphasis in original).

8. *Compare, e.g.,* plaintiff's statement of material facts, para. 5 *with* defendant's response thereto.

9. Brief for the United States, pp. 12–13, *citing Dolliff & Company, Inc. v. United States*, 599 F.2d 1015 (CCPA 1979), and *A.F. Burstrom v. United States*, 44 CCPA 27, C.A.D. 631 (1957).

10. *See, e.g.,* Plaintiff's Responses to Defendant's Statement of Additional Facts as to Which There is No Genuine Issue to be Tried, para. 2 ("Plaintiff admits that the imported cathodes could have contained copper derived from sources other than Plaintiff's exported scrap copper").

11. Plaintiff's Memorandum, p. 14.

12. Plaintiff's Reply, p. 1.

incorporation into the articles as imported. The logic behind this development, namely, nonimposition on U.S. goods, was ultimately adopted by Congress in paragraph 1615 of the Tariff Act of 1930 and later amended to allow duty-free entry for American articles of metal exported abroad for processing and then imported into the United States for further processing, the provision now at issue herein. *See* Customs Simplification Act of 1954, Pub.L. No. 768, § 202, 68 Stat. 1136, 1137–38 (1954). The report in support of section 202 stated that it would

> permit manufacturers of any article of metal (except precious metal) processed in the United States to export such articles for further processing and at the time of reimportation to pay duty on the cost of processing done in the foreign country.[13]

From this, the plaintiff deduces that the statute allows for substitution in that it was designed

> to benefit *all* United States manufacturers of metal products, who found it necessary or convenient to export metal for a portion of the required processing. Certain manufacturers, or processing procedures, or types of metal (except precious metal), were not excluded; Item 806.30 applies to *all without limitation.*[14]

However, the general rule is that, where grant of a privilege of free entry is concerned, the customs laws are to be construed "most strongly in favor of the grantor." *Becker v. United States,* 28 Cust.Ct. 404, 405, Abs. 56405 (1952). *Cf. Ford Motor Company v. United States,* 29 Cust.Ct. 553, A.R.D. 9 (1952).

An aid in interpretation of provisions of the TSUS has been the Tariff Classification Study ("TCS") of November 15, 1960. *See, e.g., Rifkin Textiles Corp. v. United States,* 54 CCPA 138, C.A.D. 925, *cert. denied,* 389 U.S. 931, 88 S.Ct. 294, 19 L.Ed.2d 283 (1967); *United States v. Andrew Fisher Cycle Co.,* 426 F.2d 1308 (CCPA 1970). It takes issue with constructive segregation on the ground of anomalous results for U.S. articles incorporated in imported merchandise. The problem, as the study indicates, is not the separability of the articles of domestic origin from the merchandise, but rather proof of incorporation therein. *See* TCS, Schedule 8, Part 1, Explanatory Notes, pp. 12–16. *See also* H.R.Rep. No. 342, 89th Cong., 1st Sess. 48–49 (1965), U.S.Code Cong. & Admin. News 1965, p. 3416. Thus, for purposes of duty allowance under item 807.00 for U.S. articles assembled abroad, for example, the TCS states that an importer must show (1) that an American part has been assembled into the imported article and (2) that such part was assembled therein without having been changed in condition. *Id.* at 14. *Cf. Samsonite Corporation v. United States,* 12 CIT ——, 702 F.Supp. 908 (1988), *appeal docketed,* No. 89–1346 (Fed.Cir. March 17, 1989).

However, under item 806.30, the focus is on the imported goods as an entirety in order to avoid constructive segregation of articles returned to this country which contain non-metal components. As the plaintiff here asserts, the TCS does not state specifically that item 806.30 required that an article of metal returned for further processing had to contain the actual metal of U.S. origin exported. Still, to deduce from this not only that substitution is plausible under the item but that, in its enactment, Congress agreed to substitution thereunder is a different matter altogether. Although a definitive answer to the question of substitution cannot be gleaned from the discernible congressional intent, something resembling a leap of faith is neces-

---

**13.** S.Rep. No. 2326, 83rd Cong., 2nd Sess. 5 (1954). *See also* 99 Cong.Rec. H8671–82 (daily ed. July 13, 1953) (statement of Mr. Knox); Valdez, *Expanding the Concept of Coproduction Beyond the Maquiladora: Toward a More Effective Partnership Between the United States and Mexico, and the Caribbean Basin Countries,* 22 Int'l Lawyer 393, 396 (1988) (item 806.30 was intended to "encourage[ ] U.S. corporations to set up a co-production factory in a foreign country in order to utilize the low cost labor in certain regions"); *Operation of the Trade Agreements Program, 40th Report, 1988,* USITC Pub. 2208, pp. 156–59 (1989).

**14.** Plaintiff's Reply, p. 2 (emphasis in original).

sary to conclude that those who voted for the item did not intend to require that an article retain at least some identifiable or quantifiable characteristic(s) from this country to which the duty forgiveness would then extend.

By way of comparison, in the drawback statute (19 U.S.C. § 1313(b)) Congress has specifically allowed for substitution of fungible articles of U.S. manufacture in place of imported articles in merchandise bound for export. Underlying this provision, of course, is encouragement of production within the United States, "thus increasing our foreign commerce and aiding domestic industry and labor." *Aurea Jewelry Creations, Inc. v. United States*, 13 CIT —, —, 720 F.Supp. 189, 189 (Sept. 7, 1989), *quoting from United States v. International Paint Co.*, 35 CCPA 87, 90, C.A.D. 376 (1948). Be that as it may, there is no indication that Congress intended to allow for similar substitution under item 806.30, TSUS. Hence, the court cannot adopt plaintiff's premise, which, in essence, amounts to a doctrine of constructive origin.

In the end, the plaintiff has not persuaded this court that the position of Customs was unlawful, particularly where it was "commercially and practically impossible" [15] to process plaintiff's scrap alone in Canada. Congress has specifically provided in 28 U.S.C. § 2639(a)(1) that, in an action such as this, the decision of the Service is presumed to be correct and the burden of proving otherwise is on the party challenging that decision. Here, the plaintiff has not borne its burden, and its motion for summary judgment must therefore be denied, with judgment to enter in favor of the defendant on its cross-motion.

15. *Supra,* page 545; Plaintiff's Memorandum, p.

16. *See* plaintiff's statement of facts, para. 11.